No. 92-244

IN THE SUPREME COURT OF THE STATE OF MONTANA

1993

---

IN RE THE PATERNITY AND CUSTODY
OF J.D., a minor child

TRACY L. GRUBB,

Petitioner and Respondent,

-vs-

TARENA L. DAPP,

Respondent and Appellant.

---

APPEAL FROM:   District Court of the Fifth Judicial District,
In and for the County of Beaverhead,
The Honorable Frank M. Davis, Judge presiding.

COUNSEL OF RECORD:

For Appellant:

Tarena L. Dapp, Great Falls, Montana, Pro Se

For Respondent:

Andrew P. Suenram; Jones, Hoffman and Suenram,
Dillon, Montana

---

Submitted on Briefs:   June 17, 1993

Decided:   August 9, 1993

FILED

AUG 9 1993

Ed Smith
CLERK OF SUPREME COURT
STATE OF MONTANA

Clerk

Justice John Conway Harrison delivered the Opinion of the Court.

Tarena L. Dapp (Tarena) appeals pro se from an order of the Fifth Judicial District Court, Beaverhead County, awarding sole custody of J.D., a minor child, to J.D.'s father, Tracy L. Grubb (Tracy). We affirm.

J.D. was born to Tarena and Tracy on April 26, 1989. Tarena and Tracy were not then and never have been married, though they lived together for a few months in 1988. Both signed an acknowledgement of paternity naming Tracy as J.D.'s natural father. Tracy also signed J.D.'s birth certificate. For almost a year after J.D. was born, Tracy kept her during weekends and on week nights when Tarena was working. Both parties lived in Great Falls that year. Tarena was working part time as a poker dealer in a casino, while Tracy was a full time engineering technician for the Montana Department of Transportation.

J.D. is Tarena's second child. Her oldest child, Christa, was approximately three years old when J.D. was born. Tracy took care of Christa while Tarena was working, before J.D. was born. After J.D.'s birth, Tracy always took Christa along when he kept J.D. He testified that he cared very much for Christa and that he and Tarena had tried to keep the two girls together.

In March 1990, Tarena and Tracy entered a written agreement concerning J.D.'s custody and support. This agreement provided for joint custody, with Tarena as the residential parent, and visitation for Tracy on weekends and for two weeks in the summer.

2

Tracy was to pay Tarena $150 per month for child support and maintain medical and hospital insurance for Tarena. For several months thereafter, Tracy kept J.D. and Christa every weekend, Friday night until Monday morning. At the time of the trial in March 1992, Tracy was current on his child support obligation, except for a disputed half month's payment for February 1991.

In July 1990, Tracy married Christine whom he had met in November 1989. Tracy and Christine moved to Fort Benton in August 1990 with Christine's daughter, Alisha, then age six. At about the same time, Tarena moved to Dillon with J.D. and Christa. Tracy and Christine kept both girls for two weeks during the summer of 1990.

Tarena became known to the Montana Department of Family Services (Family Services) in Dillon during Labor Day weekend, 1990. Her babysitter's mother called Family Services because Tarena had not come back overnight and there was no food in the house. By the time Family Services responded to the call, however, Tarena had returned home.

About six weeks later, on October 14, 1990, a friend or acquaintance of Tarena's called Family Services at 2:00 a.m. to report that the two children had been left alone in Tarena's house. A Family Services social worker and two police officers broke into the house, found the children sleeping in an upstairs bedroom, and removed them from the house. Tarena called Tracy the next day, and he and Christine went to Dillon to pick up J.D. Tracy testified that he took both girls, however, because Family Services "basically told us if we wanted our daughter we had to take

3

Christa." Concerned about the financial and legal consequences of keeping Christa, Tracy and Christine consulted a Fort Benton Family Services social worker, Diann Button, who later testified on Tracy's behalf. Button arranged for Christa to be sent back to Dillon and placed in foster care.

After a Youth Court hearing before Judge Davis on November 5, 1990, J.D. was placed in foster care in Dillon with Christa. The two children were returned to Tarena on December 14, 1990, on condition that she attend mental health counselling and parenting classes.

Tracy filed a petition for determination of paternity and modification of custody on November 20, 1990, seeking primary physical custody of J.D. After Tracy requested a custody investigation, the parties stipulated to home studies conducted by Family Services.

The parties also stipulated that Tarena would continue as primary physical custodian, pending a hearing on Tracy's petition, and that J.D. would visit Tracy for two weeks in September 1991 and two weeks in November 1991. Tarena and the two girls moved to Butte in October 1991.

On December 11, 1991, Tarena gave birth to her third child, Jacob. Jacob's father, Jeff, was living in Dillon. At the hearing in March 1992, Tarena described her relationship with Jeff as "stable" and "happy" but stated that she did not intend to marry him. In her brief on appeal she reported that Jeff had formally acknowledged paternity on December 22, 1991, and in her affidavit

4

supporting her petition to file her appeal *in forma pauperis*, she stated that he was paying $175 a month as child support.

Button visited Tracy, Christine, and Alisha three times in November 1991. She had seen J.D. with Tracy's family in October 1990, during J.D.'s temporary placement with Tracy, and she testified that she saw Christine and J.D. together in November 1991. In her home study report she described their home as a "modest, well kept two bedroom mobile home" in a Fort Benton trailer court owned by Christine's parents.

Button testified that she was familiar with Christine's extended family and described them as "committed to [J.D.]" and looking forward to having her live with Tracy and Christine on a full time basis. She recommended that Tracy have custody of J.D.

Dave Evans, a social worker with Family Services in Butte, visited Tarena's home three times in November and December 1991. He saw J.D. there only on the third visit. Evans reported that Tarena had moved to Butte to obtain Section 8 housing and that she was living in a "fairly older" two-bedroom house on the upper west side of Butte. When he visited, by appointment, the house was "very clean, well-maintained, had proper utilities, and was well-furnished," and contained ample food and clothing for the children.

According to Evans' home study report, Tarena was unemployed. She had not graduated from high school but was planning to complete a G.E.D. Her income as of December 1991 consisted of $300 a month child support from Christa's father, who lived in Seattle, and $150 a month child support from Tracy. All but $16 of her monthly rent

5

was paid through Section 8, and she was receiving food stamps and Medicaid benefits.

Evans included in his report a summary of records for 1989-90 from Family Services in Great Falls. He characterized their contents as a "history of neglect," summarized as "[Tarena] would leave the children unsupervised, would not pick them up from the babysitter until the next day and also was involved with drinking. The older child was also physically cruel to the infant."

Evans' third visit occurred on December 10, 1991, soon after J.D. had returned from a two-week visit with Tracy. He observed J.D. playing with Christa and commented that they "seem very close to one another, as stepsisters." Only one day earlier, however, Tarena had called his office to express concern about J.D.'s emotional state, and he had referred her to a licensed professional counsellor, Grainger Brown of Butte.

Brown saw Tarena and J.D. for two one-hour visits in December 1991. At Tarena's request, he wrote to her lawyer, saying that Tarena had described J.D. as "crying easily, being clingy and defiant/aggressive," and that these behaviors were "suggestive of anxiety created by separation" rather than by abuse or neglect. Brown recommended that J.D. visit her father more frequently and for shorter periods of time. Brown's letter was submitted in evidence at the trial, and he also testified on Tarena's behalf.

Based on his observations of Tarena and her children in Butte, Evans recommended that custody of J.D. be awarded to Tarena, adding that Family Services "would provide temporary, ongoing services and

6

follow up intervention if necessary."

On March 13, 1992, the District Court heard testimony by Tracy, Christine, Tarena, Button, Evans, Brown, Tarena's supervising social worker in Dillon, and a Dillon police officer. Tracy and Tarena both were represented by counsel. The court also took judicial notice of the Youth Court abuse and neglect proceeding before the same judge. On April 7, 1992, it filed its findings of fact, conclusions of law, and order, awarding exclusive custody of J.D. to Tracy.

On appeal, Tarena raises no legal issues but alleges numerous errors in the District Court's findings of fact. Tracy presents several issues, of which only one is dispositive: whether substantial credible evidence supports the District Court's modification of a de facto custody arrangement.

Tracy initiated this case by requesting a determination of paternity as well as a modification of custody, but the District Court properly addressed only the custody issue, as paternity is not in dispute.

Our standard of review for a custody determination is that the district court's decision is presumed to be correct and will not be disturbed on appeal unless there is a mistake of law or a finding of fact not supported by substantial credible evidence that would amount to a clear abuse of discretion. Matter of S.P. (1990), 241 Mont. 190, 194, 786 P.2d 642, 644; In re Marriage of Otto (1990), 245 Mont. 271, 275, 800 P.2d 706, 708.

Section 40-4-224(3), MCA, provides that an order for joint

7

custody may be modified pursuant to § 40-4-219, MCA, to terminate the joint custody. If the proposed modification merely changes living arrangements within a joint custody situation, it need not be justified by the relatively stringent criteria of § 40-4-219 but instead may be justified by a review of the best interest of the child under § 40-4-212, MCA. In re Marriage of Ferguson (1990), 246 Mont. 344, 347, 805 P.2d 1334, 1336.

Here, no order for joint custody had ever been entered. The District Court appropriately treated the parties' agreement as a "de facto custody arrangement," which may be modified, pursuant to § 40-4-219(2), MCA, "in accordance with the factors set forth in 40-4-212." In effect, then, the District Court's order is the original custody decree in this case, and the applicable statute is § 40-4-224(1), MCA, which provides that joint custody is presumed to be in the best interest of a minor child, "unless the court finds, under the factors set forth in 40-4-212, that joint custody is not in the best interest of the minor child."

The District Court stated in its findings of fact and conclusions of law that it had considered the criteria set forth in § 40-4-212, MCA, and "finds for Tracy and against Tarena on each of the relevant factors itemized." "Ordinarily," Judge Davis wrote, he is "partial to the old presumption that a child of tender years belongs in the custody of the mother." He continued:

> Unfortunately in this case that presumption if it were still applicable (which it isn't) would be overcome by Tarena's past life style and indeed her present philosophy in regard to the family concept. She discounts . . . or at least downplays the importance of a father's role in the family relationship. This

8

philosophy is, in the court's opinion, wrong. 90% of the youths who appear in Youth Court are the product of this type of philosophy, i.e., single parents with insufficient financial resources and little or no fatherly involvement.

Tarena interprets these comments, which unfortunately are consistent with the judge's frequent interjections from the bench during the trial, as evidence that Judge Davis discriminated against her based on her age, beliefs and lifestyle, and did not take into consideration the facts presented to the court. Her concern about the basis for the District Court's decision is understandable in view of a number of inappropriate remarks in Judge Davis' findings of fact. For example, he stated that Tarena has "an alarming and tragic history of family instability. At age three she became the victim of a broken home. In her early years she resided in various places with her natural mother, half sisters and brothers, and multiple stepfathers."

In fact, the Family Services home study report prepared by Evans states that Tarena's mother and stepfather were divorced when Tarena was five, not three; that she had only the one stepfather; and that she is still in contact with her natural father even though he and her mother were never married. No evidence of "alarming" or "tragic" events or circumstances appears anywhere in the record.

Judge Davis assigned considerable weight to the fact that Tarena's supervising social worker in Dillon declined, in response to his direct question, to give an opinion as to whether continued custody with Tarena was in J.D.'s best interest. She said "It's a

9

hard question to answer because I do think Tarena has tried." Earlier in her testimony, however, she told the court that Tarena had "very much improved" in her parenting abilities, and that she felt comfortable leaving the children in Tarena's care. In his findings of fact, Judge Davis rendered this statement as "She reportedly made some improvement in her parenting skills" and continued, "While her parenting skills may have improved, her morals did not. She again became pregnant. . . . The putative father is reportedly out of the state."

These latter comments contradict Tarena's testimony, in which she stated that the new baby's father was still living in Dillon and that her relationship with him was stable and happy.

Apart from these inappropriate observations, however, we conclude that the District Court's decision was based on substantial credible evidence, and that the court did not abuse its discretion in awarding sole custody to Tracy. We require only that the court express "the essential and determining facts upon which its conclusions rest." In re Marriage of Ulland (1991), 251 Mont. 160, 167, 823 P.2d 864, 869. Judge Davis met this requirement when he wrote, in a concluding comment, that:

> The court is being asked to place the child with a 22 year old single mother with a sad record of abuse and neglect, limited resources and job skills, two additional children to care for and support, and little or no prospects that the living and parenting situation will improve. . . . Comparing this bleak prospect with the stable environment of the father in Fort Benton leaves the court with no alternative.

Even if Judge Davis did exaggerate the "sad record of abuse and neglect," the record demonstrates that Tarena does have very

10

limited resources and job skills; that she depends for most of her income on child support from two men other than Tracy, one of whom lives in Seattle; and that she did not complete high school or any other program that would qualify her for employment at a level adequate to support her without the public assistance she now receives in the form of food stamps and a housing subsidy.

Tracy, on the other hand, has a long-term, full time job paying approximately $384 a week at the time of the hearing. His wife was earning additional income as a babysitter, which meant that she was available to serve as a full time caretaker for J.D. The record contains ample evidence that Tracy and Christine possess adequate, even superior parenting skills. Even Tarena testified that Tracy is an "excellent father," while conflicting testimony was offered concerning Tarena's parenting skills.

It is the function of the district court to resolve conflicts in testimony and evidence, and to decide how much weight should be assigned to a given witness' testimony or to a particular piece of evidence. Ulland, 823 P.2d at 870. We will not substitute our judgment for that of the district court unless it has clearly abused its discretion. Otto, 800 P.2d at 708; Ulland, 823 P.2d at 870. Erroneous findings of fact that are not necessary to support the trial court's judgment are not grounds for reversal. Ferguson, 805 P.2d at 1337.

Although the court displayed a deplorable insensitivity to issues of gender bias and alternative lifestyles, substantial credible evidence does support its award of exclusive custody of

J.D. to her father, based on J.D.'s best interest.

AFFIRMED.

Pursuant to Section I, Paragraph 3(c), Montana Supreme Court 1988 Internal Operating Rules, this decision shall not be cited as precedent and shall be published by its filing as a public document with the Clerk of the Supreme Court and by a report of its result to Montana Law Week, State Reporter and West Publishing Company.

_____
Justice

We concur:

_____
Chief Justice

_____

_____
Justices

12

Chief Justice J. A. Turnage specially concurring:

I concur in the result reached by the Court in this Opinion. However, I do not agree with all of the statements made in the opinion attributed to comments of the District Judge. Such statements are not necessary to a resolution of this case.

_____
Chief Justice