DA 10-0553

# IN THE SUPREME COURT OF THE STATE OF MONTANA

## 2012 MT 18

IN RE THE MARRIAGE OF
PHILIP J. TUMMARELLO,

       Petitioner and Appellant,

  and

VALERIE TUMMARELLO,

       Respondent and Appellee.

| | |
|---|---|
| APPEAL FROM: | District Court of the Twenty-First Judicial District,<br>In and For the County of Ravalli, Cause No. DR 5-184<br>Honorable Jeffrey H. Langton, Presiding Judge |

COUNSEL OF RECORD:

      For Appellant:

           Quentin M. Rhoades, Robert Erickson; Sullivan, Tabaracci & Rhoades,
           P.C.; Missoula, Montana

      For Appellee:

           P. Mars Scott; P. Mars Scott Law Offices; Missoula, Montana

                Submitted on Briefs: November 2, 2011

                        Decided: January 31, 2012

Filed:

_____
                Clerk

Justice Beth Baker delivered the Opinion of the Court.

¶1     Petitioner Phillip Tummarello (Phil) appeals three separate orders of the Twenty-First Judicial District Court pertaining to the dissolution of his marriage to Valerie Tummarello (Valerie). We affirm.

¶2     We address on appeal whether the District Court abused its discretion in:

¶3     *1. Determining and distributing the marital estate;*

¶4     *2. Determining the children would reside primarily with Valerie under the parenting plan; and*

¶5     *3. Calculating Phil's child support payments.*

## PROCEDURAL AND FACTUAL BACKGROUND

¶6     Phil and Valerie began their relationship in 1993, married in 2003, and commenced dissolution proceedings in 2005. After five years of litigation, the District Court held bifurcated bench trials to address three separate aspects of the dissolution: the parenting plan, child support obligations, and division of the marital estate. As Phil challenges the trial court's determinations in each respect, we provide a comprehensive review of the facts.

*A. Property Division*

¶7     In 1989, Phil and his then-girlfriend Marisa Cassetta purchased a home in El Granada, California (El Granada) for $289,000. They later married and subsequently divorced, but Phil retained El Granada. In late 1993, Phil and Valerie began their relationship. After approximately two years, Valerie moved into the El Granada property

2

with Phil. In April 1996, the parties' first child, M.T., was born. Valerie took several months off work to care for M.T. before returning to part-time employment. In January 1997, the parties signed and submitted a Declaration of Domestic Partnership to Phil's employer. In that declaration, the parties agreed they were in a committed relationship, they lived together, and they would be responsible for each other's living expenses and debts. While residing in El Granada, Valerie paid for household and child care expenses and assisted Phil in maintenance projects, including wallpapering a bathroom.

¶8 In 1997, Phil and Valerie purchased a vacation home in Truckee, California (Truckee) for $148,250. Trial testimony indicated he could not qualify for a loan to finance Truckee without Valerie's participation in the purchase. The deed listed the parties as tenants in common with Phil having a 55% interest and Valerie having a 45% interest in the property. Valerie stated this distribution was meant to reflect that Phil had made the down payment. Phil financed the initial expenses for Truckee by taking equity from the El Granada property. Phil also paid the mortgage payments and maintenance association fees on Truckee. Valerie landscaped part of the driveway, built a small irrigation system, and maintained the outside portions of the house. Truckee was sold in 2004 and the proceeds from that sale totaled a little over $290,000.

¶9 In 1999, Valerie and M.T. moved out of El Granada to East Bay, California. Valerie then resumed working full-time and M.T. attended daycare. Valerie worked for the California State Automobile Association for ten years prior to the parties' move to Montana. During 2000 and 2003, her income averaged approximately $100,000 per year.

3

Although the parties resided separately from 1999 to 2003, they spent holidays together at Truckee. In 2001, Valerie requested her name be removed from the mortgaged Truckee title so she could qualify for a mortgage on her own home. Phil agreed and Valerie granted her interest in Truckee to Phil. Valerie testified she made offers on three different properties but was outbid on each. She stated she was unable to purchase real property in her own name due to the competitive real estate market in California at that time.

¶10 Valerie and M.T. moved back into El Granada with Phil in 2003. By that time, Phil had suffered a work-related injury resulting in temporary disability. The parties married on August 16, 2003. Phil testified the fair market value of El Granada at the time of the marriage was $630,000. In October 2003, Phil added Valerie's name to the El Granada deed and the parties owned the property as tenants in common. Phil paid the El Granada mortgage payments and property taxes. He also testified he paid the utilities and performed maintenance and made significant improvements on that property. Valerie testified that when she lived at El Granada, she paid for groceries, household expenses, and entertainment along with performing maintenance on the home and yard. Valerie also paid for all expenses related to M.T., with the exception of a crib Phil bought. She noted these expenditures included daycare and nanny services totaling $12,000 a year. Valerie also paid off her student loans during this time.

¶11 In 2004, Phil and Valerie bought a home on Iron Cap Drive in Stevensville, Montana (Iron Cap) for $367,000. They purchased Iron Cap as joint tenants with rights of survivorship and paid the $74,000 down payment with funds derived from refinancing El Granada. In March 2004, Valerie gave birth to the parties' second child, V.T. The parties moved to Montana in August that year. Valerie left her job upon moving to Montana and has earned no significant income since. In December 2004, unable to return to work, Phil began receiving disability retirement benefits. By the time of trial, his pension benefits amounted to approximately $7,400 per month, two-thirds of which Phil claims is tax-free.

¶12 On November 30, 2005, Phil filed for dissolution of the marriage but the parties continued to live together at Iron Cap. In 2006, El Granada was sold and the proceeds, amounting to approximately $241,600, were deposited in the parties' joint bank account pursuant to order of the District Court. In 2007, Phil moved out of Iron Cap and Valerie continued to reside on the property.

¶13 In October 2009, the court conducted a bench trial on the division of the marital estate. Valerie argued she had a one-half interest in Iron Cap. Phil claimed Valerie had no interest in Iron Cap or the proceeds from El Granada or Truckee because El Granada was his premarital property, and Truckee and Iron Cap were purchased with funds from El Granada. In its order, the District Court found both El Granada and Truckee were marital assets. The court based its determination on the contributions the parties made throughout their relationship, along with Phil's act of transferring one-half interests in

5

both properties to Valerie. Valerie provided an appraiser at the hearing who estimated the fair market value of Iron Cap in 2008 to be $675,000. Phil hired a second appraiser who placed that figure at $482,000. After reviewing the testimony of both appraisers, the District Court adopted the lower value provided by Phil's appraiser. The court then issued a distribution scheme for Iron Cap which allowed both parties an opportunity to buy out the other's interest in Iron Cap by paying half of its appraised value. If neither Phil nor Valerie executed that option, Iron Cap was to be sold with the proceeds split equally between the parties. The court also ordered the remaining proceeds from the El Granada property to be divided equally between the parties. Although that amount initially was over $240,000, the parties have all but exhausted those funds to pay for their extensive litigation costs, expert witness fees and the multiple evaluations conducted in the course of this proceeding. The court found there should be no division of either party's retirement assets and each would keep his or her separate retirement funds.

### B. Parenting Plan

¶14 In late 2006 and early 2007, the parties underwent parenting evaluations by clinical psychologists Phil Bornstein and Hallie Bornstein Banziger (the Bornsteins). In February 2007, the Bornsteins issued their joint report recommending equal parenting time in alternating week-on, week-off schedules, with one day mid-week with the non-residential parent. Phil first filed an objection to the report, in part, because it failed to adequately evaluate Valerie's mental health and fitness to parent. Valerie later objected to the report because the recommended parenting time was premised on an

erroneous determination of V.T.'s age. Valerie also objected insofar as the report stated Phil had "an absence of major psychopathological symptomatalogy [sic]." In support of his objection, Phil hired an expert to evaluate the Bornsteins' Report and additional experts to evaluate Valerie.

¶15   In May 2007, the court held a hearing to determine an interim parenting plan and ordered a temporary parenting schedule in accordance with the recommendation in the Bornsteins' Report. The court also appointed Nancy Smith as Guardian ad Litem (GAL) for the parties' children. The appointment vested Smith with authority to establish and modify a parenting schedule during the pendency of the dissolution proceedings. Smith spent several months working with both parties and interviewing numerous people in preparation for making recommendations for a final parenting plan. However, the communication between Valerie and Smith broke down when Smith refused to make a recommendation regarding Valerie's request to take the children to California to visit relatives in December 2007. As a result, Valerie was forced to cancel her trip days before she was to leave and after she had purchased airline tickets.

¶16   In April 2008, Smith issued her GAL Recommendations for Permanent Parenting Plan and Change in Parenting Schedule. Under the new plan, instead of the alternating week schedule, the children would spend every other weekend with Valerie but reside primarily with Phil. Smith testified she developed this schedule by taking Valerie's suggested parenting plan and reversing it, putting Valerie in the position she had proposed for Phil. On Valerie's motion, the court set a hearing on Smith's

7

recommendations. At the conclusion of the hearing, the court found Smith's report contained conclusory and negative statements about Valerie which were in direct contradiction to Smith's earlier findings in an Interim Status Report and to the opinions of experts who evaluated Valerie in this matter. The court went on to list several deficiencies in Smith's report and indicated the breakdown in trust and communication between Valerie and Smith seriously compromised Smith's ability to act as GAL. As a result, the court subsequently ordered the interim parenting plan be restored with the schedule proposed by the Bornsteins, appointed Julie Crane as Supplemental GAL, and limited Smith's GAL authority to communicating with Crane regarding Smith's previous investigative work.

¶17 Crane conducted her own investigation during which she met with Phil and Valerie numerous times, spoke with the children several times, communicated with Smith, interviewed witnesses, reviewed hearing transcripts, and reviewed all the expert reports prepared in this case. On November 6, 2008, she issued her Supplemental GAL Report. Crane found both parties to be loving, capable, and competent parents. Based on the best interests of the children, and considering the wishes of M.T., Crane recommended the children reside primarily with Valerie but have extended weekend and alternating overnight mid-week visits with Phil.

¶18 In December 2008, the court held a bench trial on the parenting plan in which Smith and Crane both testified regarding their reports. In its August 2009 order, the court entered detailed findings of fact and concluded that Crane's report was in the best

interests of the children and would be adopted as the Final Parenting Plan. Under that Plan, the children reside with Valerie and have extended weekends with Phil every other week. During the extended weekends, M.T. resides with Phil from Wednesday after school (or beginning at 9:00 a.m. during the summer) until Sunday at 7:30 p.m. V.T.'s extended weekend schedule is identical, except that it begins Thursday instead of Wednesday. On alternating weeks, the children each have one overnight visit with Phil mid-week, beginning after school and ending when they go to school the following morning (or, during the summer, from 9:00 a.m. the first day until 9:00 a.m. the following day).

*C. Child Support*

¶19    In September 2010, the court held a hearing regarding child support. Phil testified that, while his tax returns for 2008 demonstrated none of his income was taxed, about a third of his income usually is taxable. Phil did not offer his 2009 federal income tax return into evidence. Based on Phil's documentation from 2008, the court did not award Phil any tax deductions in its calculation of child support. In determining its calculations, the court concluded M.T. and V.T. spend five and four days with Phil, respectively, over a two-week period. However, Phil claims the court's final parenting plan actually reflected M.T. spends six days with Phil and V.T. spends five days with Phil during each two-week period.

¶20 Finally, the court ordered the parties to pay their own attorney's fees and costs, except Phil was ordered to pay the attorney's fees, expenses, and costs Valerie incurred in defending against Phil's claim that she was mentally unfit to parent the children.

## STANDARD OF REVIEW

¶21 We review a district court's factual findings pertaining to the division of marital assets and a parenting plan to determine if they are clearly erroneous. *In re Marriage of Thorner*, 2008 MT 270, ¶ 20, 345 Mont. 194, 190 P.3d 1063. "A finding is clearly erroneous if it is not supported by substantial evidence, the district court misapprehended the effect of the evidence or our review of the evidence convinces us that the district court made a mistake." *In re Marriage of Crilly*, 2005 MT 311, ¶ 10, 329 Mont. 479, 124 P.3d 1151. If the court's findings are not clearly erroneous, we will reverse only if the district court abused its discretion. *Crilly*, ¶ 10. Likewise, we will not overturn a district court's child support award absent an abuse of discretion. *In re Marriage of Graham*, 2008 MT 435, ¶ 8, 347 Mont. 483, 199 P.3d 211. "[T]he test for an abuse of discretion is whether the district court acted arbitrarily without employment of conscientious judgment or exceeded the bounds of reason resulting in a substantial injustice." *In re Marriage of Jackson*, 2008 MT 25, ¶ 9, 341 Mont. 227, 177 P.3d 474.

## DISCUSSION

¶22 *1. Whether the District Court abused its discretion in determining and distributing the marital estate.*

¶23 A district court is vested with broad discretion to apportion a marital estate in a manner equitable to each party under the circumstances. *In re Marriage of Bartsch*, 2007

MT 136, ¶ 9, 337 Mont. 386, 162 P.3d 72; *In re Marriage of Clark*, 2003 MT 168, ¶ 20, 316 Mont. 327, 71 P.3d 1228. Specific factors the trial court must consider, set forth in § 40-4-202(1), MCA, are:

> the duration of the marriage and prior marriage of either party; the age, health, station, occupation, amount and sources of income, vocational skills, employability, estate, liabilities, and needs of each of the parties; custodial provisions; whether the apportionment is in lieu of or in addition to maintenance; and the opportunity of each for future acquisition of capital assets and income. The court shall also consider the contribution or dissipation of value of the respective estates and the contribution of a spouse as a homemaker or to the family unit. In dividing property acquired prior to the marriage; property acquired by gift, bequest, devise, or descent; property acquired in exchange for property acquired before the marriage or in exchange for property acquired by gift, bequest, devise, or descent; the increased value of property acquired prior to marriage; and property acquired by a spouse after a decree of legal separation, the court shall consider those contributions of the other spouse to the marriage, including:
> (a) the nonmonetary contribution of a homemaker;
> (b) the extent to which such contributions have facilitated the maintenance of this property; and
> (c) whether or not the property division serves as an alternative to maintenance arrangements.

Based upon these factors, the statute directs the district court to "finally equitably apportion between the parties the property and assets belonging to either or both, however and whenever acquired and whether the title thereto is in the name of the husband or wife or both." Section 40-4-202(1), MCA.

¶24 The District Court found that for most years since 1995 the parties have used the entirety of their collective incomes to support themselves and their children; that the parties purchased Truckee together; that, although Phil had paid the mortgage and other expenses related to the California properties, Valerie paid the remainder of the family's

11

household and living expenses; that, while the parties were separated, Valerie provided care and the majority of financial support for M.T.; that the parties' move to Montana required Valerie to give up her job and career, partially in consideration for which Phil transferred to Valerie an interest in the California properties; and that, following their relocation, Phil supported the family financially and Valerie provided the non-monetary contributions of homemaker and primary care provider for the children. Consequently, the court determined both El Granada and Truckee were marital assets. Since the proceeds from sale of the two properties were used to purchase and make improvements to Iron Cap, the court also found it to be a marital asset.

¶25 Phil attacks the District Court's property division on several grounds. He first asserts the court erred when it included both El Granada and Truckee in the marital estate. Phil argues that because he acquired El Granada before his relationship with Valerie, made all payments associated with that property, and purchased Truckee with the equity from El Granada, the proceeds of both should be excluded from the marital estate. We disagree. As noted above, the statute directs apportionment of *all* property belonging to *either or both* spouses, "however and whenever acquired." Section 40-4-202(1), MCA. In determining the division of the property acquired prior to the marriage, the statute sets forth specific factors to guide the court's determination. When a trial court's findings reflect that it properly considered the various factors enumerated in the statute, it will not be held in error. *In re Petition of Fenzau*, 2002 MT 197, ¶ 36, 311 Mont. 163, 54

12

P.3d 43. Here, the District Court carefully weighed and properly considered all the statutory factors.

¶26 Although Phil stated "Valerie contributed nothing to the preservation or maintenance of the properties[,]" the statute requires consideration of Valerie's contributions "to the *marriage*," including but not limited to the extent to which those contributions facilitated the maintenance of the pre-acquired property. Section 40-4-202(1) and (1)(b), MCA (emphasis added); *In re Marriage of Funk*, 2012 MT 14, ¶ 25, ___ Mont. ___, ___ P.3d ___. There is substantial credible evidence in the record to support the District Court's finding that Valerie made significant contributions to the marriage. First, the testimony demonstrated that Valerie helped maintain both properties by performing interior and exterior projects. Second, Phil would not have qualified to buy Truckee without Valerie. Third, when Valerie was working, she earned a substantial salary and used those funds to pay for household expenses and support of the family. She paid for the expenses related to M.T., including daycare and nanny costs of $12,000 a year. These expenditures freed Phil's income to make payments on the properties. Finally, when Valerie was not working, she provided child care herself which again allowed Phil to pay for the mortgages and improvements. The District Court considered the assets and liabilities of each of the parties and found they combined their resources to divide expenses for support of the family and maintenance of the properties. It did not abuse its discretion when it considered the proceeds of El Granada and Truckee as marital assets.

13

¶27     Phil next asserts the District Court's equal division between the parties of proceeds from sale of the properties was clearly erroneous because Valerie's expenditures represented merely a fraction of the amount Phil paid in down payments, mortgage payments, maintenance fees and taxes on the properties. After reviewing the extensive record and the District Court's findings and conclusions, we conclude the court properly followed the directives of the statute. The particularity and comprehensiveness of the court's findings in this case demonstrate it gave conscientious consideration to both parties' monetary and nonmonetary contributions to the marriage. In particular, the court specifically noted Phil paid the mortgages and other expenses related to El Granada and Truckee. Phil argues the District Court erred in finding he restored Valerie's name to the Truckee property. This assertion is directly contradicted by Phil's deposition testimony, in which he stated he put Valerie's name back on the title after they were married and that the Truckee sales check was made payable to both of them. Phil agreed the proceeds were paid to the parties jointly at the time the property was sold.

¶28     As specifically contemplated by the statute, the court denied Valerie's request for maintenance, in part, because she would receive liquid assets of one-half the remaining proceeds from the properties to pay her reasonable living expenses. Clearly, "pre-acquired property can be distributed to a non-acquiring spouse *in lieu of maintenance*, regardless of whether she contributed to its increase in value, if the 'property division serves as an alternative to maintenance arrangements.'" *In re Marriage of Rolf*, 2003 MT 194, ¶ 22, 316 Mont. 517, 75 P.3d 770 (emphasis in original)

14

(quoting § 40-4-202(1)(c), MCA) (overruled on other grounds by *Funk*, ¶ 25). *Funk* did not disturb *Rolf's* recognition that distribution of property in lieu of maintenance is appropriate under the statute if the District Court makes clear its intention to do so. *Funk*, ¶¶ 19, 24.

¶29 Finally, Phil asserts the District Court erred when it failed to account for the increased value of El Granada and Truckee due to market factors pursuant to *In re Marriage of Dahm*, 2006 MT 230, ¶ 27, 333 Mont. 453, 143 P.3d 432. The District Court, however, specifically noted Valerie's contributions to the properties and Phil's failure to demonstrate whether improvements had been made before or during the parties' relationship. Moreover, we have now rejected the notion "that the non-acquiring spouse is 'entitled only to an equitable share of the appreciated or preserved value of [husband's] pre-acquired and gifted contributions which is attributable to her efforts.'" *Funk*, ¶ 26 (citation omitted). Instead, a trial court has discretion to examine the circumstances surrounding each case where pre-acquired property is at issue:

> The court's decision with respect to this category of property must affirmatively reflect that each of these factors was considered and analyzed, and must be based on substantial evidence. However, we stress that while the factors set forth in § 40-4-202(1)(a)-(c) must be considered by the court, they are not limitations on the court's obligation and authority to equitably apportion all assets and property of either or both spouses based upon the unique factors of each case.

*Funk*, ¶ 19. The reason for any appreciation in value of El Granada and Truckee, while a factor for consideration, is not determinative of Valerie's equitable share of the marital estate.

¶30 Here, the District Court followed the directive of § 40-4-202(1), MCA, and properly considered Valerie's contributions to the marriage as a homemaker, how those contributions facilitated the maintenance of the properties, and whether a maintenance award was appropriate given the court's property division. The court also considered factors unique to this case, including Phil's act of adding Valerie's name to the El Granada deed to serve as a financial safety net for Valerie in exchange for foregoing her career in California and moving to Montana. Phil has not carried his burden of demonstrating the District Court's findings were clearly erroneous or otherwise constituted an abuse of discretion.

¶31 *2. Whether the District Court abused its discretion in determining the children would reside primarily with Valerie under the parenting plan.*

¶32 Phil asserts the District Court erred in its determination of a final parenting plan by failing to consider adequately the recommendations of GAL Smith and the Bornsteins. In essence, Phil argues Crane was not qualified to offer opinions as to the children's best interests because her credentials were not as expansive as Smith's or the Bornsteins'. Phil also contends the District Court's reasons for rejecting Smith's report did not relate to the best interests of the children. We find no merit in any of these arguments.

¶33 The District Court considered at length the testimony and recommendations of both GALs, the Bornsteins, and the myriad professionals involved during the course of the proceeding. The court specifically noted Smith's extensive investigation and suggested she and Crane collaborate during Crane's formation of her supplemental report. The court's findings include a detailed summary of each GAL's testimony, the

16

expert testimony the court heard at the previous hearing on Smith's recommendations, and a thorough analysis of the best interests of the children, as set forth in § 40-4-212, MCA. The record demonstrates the court carefully evaluated the information provided by Smith, the Bornsteins, and Crane, as well as the parties' retained experts.

¶34 Phil's argument that Crane's recommendations are entitled to less weight because her educational and professional degrees do not stack up to those of Smith and the Bornsteins is unavailing. Crane testified regarding her training and extensive experience as a GAL, and Phil cites no authority for the proposition that the District Court should have disregarded her testimony solely on the basis of her educational background. Rather, we have held that judgments regarding the credibility of witnesses and the weight to be given their testimony are within the province of the District Court and we will not substitute our judgment for its determinations. *In re Marriage of Meeks*, 276 Mont. 237, 247, 915 P.2d 831, 837-38 (1996). We have also specifically recognized the District Court's broad discretion when considering the parenting of a child. "Child custody cases often present the court with difficult decisions. We must presume that the court carefully considered the evidence and made the correct decision." *In re Parenting of N.S.*, 2011 MT 98, ¶ 18, 360 Mont. 288, 253 P.3d 863. Here, Phil's emphasis on Smith's and the Bornsteins' superior educational background, in itself, is insufficient to show the court's conclusions were clearly erroneous.

¶35 Despite their differing recommendations, the three expert reports were unanimous in their views that both Phil and Valerie are capable, loving parents committed to their children. The District Court was entitled to evaluate the reports and testimony and adopt those recommendations it determined to be in the children's best interest. We find no merit in Phil's contention that the District Court dispensed with Smith's recommendation in favor of Crane's without considering the best interests of the children. The court specifically found "Smith's proposed final parenting plan is not in the best interests of the children." This District Court reached this determination based on the following:

> The GAL's Recommendations are deficient in several respects, including: (1) the primary basis for the GAL's Recommendations appears to be Ms. Smith's perception that Valerie has disregarded her authority; (2) another important basis for the GAL's Recommendations appears to be Ms. Smith's unsubstantiated and irrelevant perceptions that Valerie is intentionally draining the parties' marital assets through litigation and deliberately choosing not to work; (3) there is a lack of reference to any supporting factual data for Ms. Smith's opinions and conclusions; (4) Ms. Smith failed to solicit or consider the wishes of the parties' children; and (5) Ms. Smith failed to visit with 12-year-old M.T. even once during the ten months preceding the filing of her report.

¶36 The court also was concerned with "Smith's technique of reversing one parent's suggested parenting plan in favor of the other parent" because it appeared "to be a punitive technique with no nexus to the best interests of the children." In contrast to Smith's plan, the court noted the following about Crane's recommendation:

> Ms. Crane met with both parties five times, spoke with the parties numerous times via phone, spoke with the parties' children several times, spoke with Ms. Smith, interviewed witnesses, reviewed transcripts of various hearings in this case, and reviewed all expert reports prepared in this case. . . . Ms. Crane found that both parties are loving, capable, and competent parents. Based on the best interests of the children, and

18

considering the wishes of M.T., Ms. Crane recommended the children reside primarily with Valerie, the children spend extended weekends with Phil every other weekend, and that during the weeks that Phil does not have an extended weekend, the children have separate mid-week overnight visits with him in order to give each child time alone with each parent. . . . In addition to recommending a final parenting plan, the Supplemental GAL's Report provides the data and expert opinions on which Ms. Crane relied in making her recommendation. In making her recommendation, Ms. Crane considered the wishes of the children.

Phil states "the district court offers no indication whatsoever why it flatly rejected the Bornsteins' professional opinion that the children should spend alternating weeks with their parents." Again, Phil has mischaracterized the record. The court found the following in regard to an equal-time parenting plan:

> V.T. (age 5) is too young to express his wishes for a parenting schedule. Ms. Crane found that V.T. has a difficult time separating himself from his mother at the end of her parenting weeks and spends considerable time on the phone with his mother while in his father's care. Ms. Crane observed V.T. to be more confident and outgoing in the presence of his mother than in his father's presence. On the basis of these observations, Ms. Crane concluded that V.T. needs to spend more time with his mother than the current alternating week schedule permits.
> Interaction and interrelationship of the child with the child's parents and siblings.
> M.T. and V.T. are very close and have remained together under the current alternating week schedule. It is important for them to continue to remain together. However, they are eight years apart in age, and M.T. has expressed a wish to have occasional time alone with each parent.

There was substantial evidence to support the conclusions reached by the District Court regarding the parenting plan. Both the record and the court's findings demonstrate the trial judge exhaustively considered each witness's testimony, qualifications, and reports to determine the best interests of the children in rendering its final parenting plan. We find no clear error in its findings and no abuse of discretion in its determination.

¶37    *3.   Whether the District Court abused its discretion in calculating Phil's child support payments.*

¶38    Phil contends the District Court's child support calculation failed to deduct taxes from Phil's disability income and pension even though the court found one-third of Phil's income is taxed.   In calculating a parent's income for purposes of a child support calculation, a district court is required to make deductions from that parent's income. Admin. R. M. 37.62.116.   One of the allowable deductions is "the actual income tax liability based on tax returns.   If no other information is available, use the tax tables which show the amount of withholding for a single person with one exemption[.]" Admin. R. M. 37.62.110(1)(d).   Here, Phil's tax returns for both 2007 and 2008 showed he had no actual tax liability; however, he asserted one-third of his income usually is taxed.   Phil did not enter his 2009 tax return into evidence even though the court conducted a hearing regarding child support in September 2010.   While Valerie entered her 2009 tax return into evidence, Phil failed to do so and he never asserted it was unavailable.   In compliance with the rule, the District Court calculated the deductions "based on tax returns" submitted by the parties.   Based on Phil's 2008 tax return, the court awarded Phil no tax deduction in its child support calculation.   The court did not abuse its discretion in declining to award Phil a deduction for which he provided no evidence.

¶39    Finally, Phil contends the District Court erred when it calculated Phil's child support based on M.T. spending five days with Phil and V.T. spending four days with Phil when the court's parenting plan actually allocated six and five days with the

20

children. Phil argues the error was compounded when the court calculated the number of days per year the children spend with him.

¶40 A "day" for the purpose of child support is "when a child spends the majority of a 24 hour calendar day under the control of the parent." Admin. R. M. 37.62.138(3). Valerie argues that under the strict application of this language, Phil actually received more credit than he was due because he should not be entitled to any "day" when the children are in school and not under Phil's control. We previously affirmed a District Court's determination on this issue in *In re Marriage of Kummer*, 2002 MT 168, 310 Mont. 470, 51 P.3d 513. We noted the lack of guidance provided in the rule for determining what constitutes a "majority of the day" when children spend part of the day not under the explicit control of either parent. *Kummer,* ¶ 28. Absent articulation of a more precise standard, we stated, "we will review a district court's determination of which parent 'gets credit' for certain hours of a day[] for an abuse of discretion." *Kummer*, ¶ 29.

¶41 Here, while the District Court did not address the specific hours M.T. and V.T. spend with Phil on the days they are in school, it appears to have counted the days in each two-week period by combining consecutive twenty-four hour periods as stated in the parenting plan. Although the specific calculation may vary by when the twenty-four hour period begins and ends, and whether it occurs during the school year or summer schedule, we cannot conclude the District Court abused its discretion in applying the language of the administrative rule and we will not reverse the court on this ground.

21

¶42 Finally, Valerie requests we order Phil to pay her attorney fees and costs incurred on this appeal. We may award sanctions, including costs and attorney's fees, in an appeal where the claim for relief is "frivolous, vexatious, filed for purposes of harassment or delay, or taken without substantial or reasonable grounds." M. R. App. P. 19(5). In support of her position, Valerie underscores that the District Court awarded Valerie her attorney's fees and costs incurred in rebutting Phil's allegations regarding her mental and psychological condition. This is not an argument he has renewed on appeal. Valerie also asserts the issues Phil raised were groundless because they were fully analyzed and addressed in the detailed, complete and accurate findings of the District Court. Although we find Phil's arguments lack merit, we cannot conclude they were entirely frivolous or lacking in good faith. *In re Chamberlin*, 2011 MT 253, ¶ 26, 362 Mont. 226, 262 P.3d 1097. Accordingly, we decline to award Valerie her attorney's fees in this appeal.

## CONCLUSION

¶43 Phil has failed to show the District Court's equitable distribution of the marital estate, its determination of an appropriate parenting plan for the children, or its calculations of child support lacked credible support in the evidence or otherwise constituted an abuse of discretion. The judgment of the District Court is affirmed in all respects.

/S/ BETH BAKER

22

We concur:

/S/ MIKE McGRATH
/S/ PATRICIA COTTER
/S/ BRIAN MORRIS
/S/ JIM RICE