FILED

12/23/2025

Bowen Greenwood
CLERK OF THE SUPREME COURT
STATE OF MONTANA

Case Number: DA 25-0161

DA 25-0161

IN THE SUPREME COURT OF THE STATE OF MONTANA

2025 MT 297N

IN RE THE PARENTING OF

A.C.P.S.,

ANTHONY TYLER,

      Petitioner and Appellant,

  and

ASHLEY SMITH,

      Respondent and Appellee.

APPEAL FROM:    District Court of the Ninth Judicial District,
In and For the County of Toole, Cause No. DR-22-03
Honorable Kaydee Snipes Ruiz, Presiding Judge

COUNSEL OF RECORD:

      For Appellant:

      Christopher S. Fisher, Montana Families PLLC, Helena, Montana

      For Appellee:

      Meghan Lulf Sutton, Law Office of Meghan Luff Sutton, Great Falls,
Montana

           Submitted on Briefs:  September 17, 2025

                  Decided:  December 23, 2025

Filed:

                    _____
                            Clerk

Chief Justice Cory J. Swanson delivered the Opinion of the Court.

¶1 Pursuant to Section I, Paragraph 3(c), Montana Supreme Court Internal Operating Rules, this case is decided by memorandum opinion and shall not be cited and does not serve as precedent. Its case title, cause number, and disposition shall be included in this Court's quarterly list of noncitable cases published in the Pacific Reporter and Montana Reports.

¶2 Anthony Tyler filed a petition in the Ninth Judicial District Court for Toole County, seeking a parenting plan granting him primary guardianship over A.C.P.S. The case was referred to a standing master, who adopted the Mother Ashley Smith's proposed parenting plan instead. Tyler filed an objection to the standing master's findings in the District Court, and the District Court affirmed. Tyler now appeals to this Court, arguing the standing master erred in her findings of fact. We reverse and remand.

¶3 The two parents were never married and only had a brief romantic relationship which led them to conceive A.C.P.S. Both parents have children from previous relationships.

¶4 Smith has a history of drug abuse. After A.C.P.S. was born, he experienced drug withdrawal symptoms, which resulted in extending A.C.P.S.'s stay in the Neonatal Intensive Care Unit (NICU). A youth in need of care (YINC) case was opened against Smith. The YINC case was ultimately dismissed, with Tyler receiving full custody of A.C.P.S. While Tyler initially allowed Smith to have A.C.P.S. three to four nights a week,

as disagreements between the parents arose, Tyler arbitrarily restricted Smith's parenting time. Tyler filed this suit to obtain permanent primary guardianship.

¶5 The case was referred to the standing master. When Tyler discovered Smith had retained an attorney, he prohibited most contact between her and A.C.P.S. He repeatedly withheld parenting time and phone calls between Smith and A.C.P.S. if he was displeased with the legal proceedings.

¶6 Tyler resided with his girlfriend and now-wife Hailey Seymour. Tyler referred to Seymour as A.C.P.S.'s "mother" and referred to Smith as an "incubator." Tyler would also taunt Smith by stating he was "undefeated" in family court, he was going to "destroy" her in court, and he was going to "have to watch [her] cry." Occasionally, Tyler texted Smith expressing support for her Treatment Court participation, then sent emails to Smith's Treatment Court coordinator alleging she mishandled Smith's case and threatening to report her to the Montana Attorney General.

¶7 Eventually, significant concerns arose surrounding Tyler's parenting of A.C.P.S. Smith filed a Motion for Emergency Ex Parte Interim Parenting Plan on January 27, 2023. The motion included Tyler's text messages to Seymour, where he made statements expressing suicidal ideation. Tyler sent these messages to Seymour "over the Christmas Holiday" in late December 2022. At that time, Tyler and Seymour had broken off their relationship. Seymour forwarded screenshots of Tyler's messages to Smith. Later on, Tyler accused Seymour—who by then was his wife—of forging those messages as part of a revenge plot against him. Seymour also allegedly recanted the messages after the two reconciled and married.

3

¶8 Smith's motion for a parenting plan proceeded to a show cause hearing, held on February 16, 2023. Doreen King, who owns and operates Big Sky Drug Testing, obtained a hair follicle from A.C.P.S. and sent it to a lab for analysis. The test came back positive for Tetrahydrocannabinol, or THC, the main psychoactive compound in marijuana. King testified it takes 7–10 days for marijuana to show up on a test and Tyler had exclusive control over A.C.P.S. during the timeframe of drug exposure indicated by the test. On cross-examination, King testified she learned of the date range through her training, and she was not qualified to answer whether the time range is different between adults and children.

¶9 Linda Lequin, the paternal grandmother of Ashley's other child, testified about Tyler's messages to Seymour. On direct examination, Lequin testified Tyler told her, over the phone, he sent these messages to Seymour. Lequin also testified about suspiciously similar comments Tyler allegedly made directly to her. Lequin did not tell Smith about Tyler's comments until after Smith received the Seymour messages and she filed her motion for an emergency parenting plan.

¶10 Smith testified about Tyler's taunting text messages about "destroy[ing]" her in court or being "undefeated." She also testified about Tyler arbitrarily withholding her parenting time with A.C.P.S. When Smith attempted to introduce all of Tyler's messages in a single exhibit, Tyler objected, arguing the messages needed to be introduced separately for the purpose of laying a foundation because their formatting was distinct. The standing master, displeased Tyler waited until the hearing to raise his foundation objection, overruled his objection.

4

¶11 Smith then sought to read the messages on the stand without admitting them into the record. Tyler objected to this form of introduction, arguing Smith cannot read the messages into the record without admitting them as an exhibit. During Smith's testimony, the standing master concluded the hearing after growing frustrated by the number of objections. She explained, "You know what, I'm done. I'm done for the day. I can't do this any more today. It's five to 6." A second hearing was scheduled, but a winter storm caused the hearing to be delayed until April. In the April hearing, Smith resumed her testimony. This time, she admitted Tyler's messages into the record as separate exhibits. These messages were not the Seymour "suicidal ideation" text messages mentioned by Lequin.

¶12 Other incidental witnesses also testified during the hearing. Tonya Carpenter testified for Tyler as an expert on early childhood attachment and substance addiction. She testified A.C.P.S. became attached to Tyler and recommended placement with Tyler. She also testified Tyler did not show any signs of addictive behavior and had a low risk of suicide. Brooke Rogers, the treatment coordinator for the Ninth Judicial District Court, testified Smith was successfully progressing in the drug treatment program. Rogers testified she received Tyler's emails accusing Smith of an unspecified crime and threatening to report Rogers to the Montana Attorney General. Lastly, the guardian ad litem (GAL) testified as to his recommendation that Tyler should be awarded primary custody and Smith should receive "unsupervised parenting time with A.C.P.S. as often as can be achieved with the distance between the parties . . . ."

5

¶13 After the hearing concluded, Smith filed a motion for discovery sanctions against Tyler because he failed to turn over his Illinois criminal record. After ultimately receiving the criminal record and admitting it into the record, the standing master issued her Findings of Fact, Conclusions of Law and Final Parenting Plan Order on August 18, 2023. Prior to the parenting plan taking effect, the standing master required Tyler to complete at least six four-hour supervised visitations, followed by three overnight stays. Upon completion of this visitation, Tyler was provided one visitation a month, and 50-50 parenting time during the summer when the child reached school age. A.C.P.S.'s primary residence was still with Smith. The standing master also granted Smith's motion for contempt for Tyler's failure to turn over his criminal history.

¶14 Tyler objected to the standing master's findings to the District Court, and the District Court affirmed the standing master's findings of fact and conclusions of law. Tyler now appeals to this Court, arguing the standing master's findings of fact are clearly erroneous. Tyler challenges: (1) findings related to Tyler's December 2022 messages to Seymour where he expressed suicidal ideation; (2) findings on A.C.P.S.'s exposure to drugs; (3) findings based on Carpenter's testimony and credibility; and (4) the standing master's disregard of the GAL report and recommendation.

¶15 Two standards of review are relevant in cases involving both a standing master and the district court: the standard the district court applies to the master's report and the standard we apply to the district court's decision. *In re G.J.A.*, 2014 MT 215, ¶ 11, 376 Mont. 212, 331 P.3d 835 (citation omitted). "We review a district court's decision *de novo* to determine whether it applied the correct standard of review to a standing

6

master's findings of fact and conclusions of law." *Davis v. Davis*, 2016 MT 52, ¶ 4, 382 Mont. 378, 367 P.3d 400 (citing *In re G.J.A.,* ¶ 11). In a nonjury action, M. R. Civ. P. 53(e)(2) requires a district court to "accept the master's findings of fact unless clearly erroneous." "A finding is clearly erroneous if it is not supported by substantial evidence, if the Master misapprehended the effect of the evidence, or if [the reviewing court's] review of the record convinces the reviewing court that the Master made a mistake." *In re G.J.A.*, ¶ 21 (citation omitted).

¶16     "The standing master shall make a record of the evidence offered and excluded in the same manner and subject to the same limitations as provided in the Montana Rules of Evidence for a court sitting without a jury." Section 3-5-124(3)(c), MCA.

¶17     On appeal, Tyler reiterates some of the objections he raised in the District Court. First, he objects to findings of fact surrounding his messages to Seymour, wherein Tyler expresses suicidal ideation. Tyler argues the messages were never admitted into evidence and Smith never laid a foundation for their introduction.[1] Relying on these messages, the standing master found Tyler "sent multiple concerning text messages over the Christmas Holiday stating he was going to kill himself," and found the allegation of a revenge plot orchestrated by his future wife as "not reflect[ing] a stable and healthy relationship or environment."

¶18     Seymour, the purported recipient of the messages, never testified during the hearing. The messages were only brought in through Smith's motion for an emergency

---

[1] During the hearing, Tyler argued these messages were forged by Seymour, but he does not raise this argument on appeal.

parenting plan. During the hearing on the motion, only Lequin mentioned these messages. Lequin testified Tyler stated, during a phone call with her, he would commit suicide. Lequin also testified Tyler told her he sent the messages to Seymour.

¶19    On appeal, Smith argues "[she] properly testified during the February 16, 2023, hearing regarding [Tyler's] written admissions." The District Court also cited Smith's testimony when holding these findings of fact are supported by the record. However, the record of Smith's testimony does not support this conclusion. Smith only testified about messages dealing with Tyler's "sudden change of attitude about coparenting." These were not the Seymour messages about suicidal ideation.

¶20    The standing master directly references the motion for ex-parte parenting plan in the relevant findings of fact. On the other hand, the District Court relied on Lequin's and Smith's testimony to conclude these findings of fact were supported by the record. Tyler now challenges the standing master's findings, arguing they were based on text messages which Smith never properly authenticated and never admitted into the record.

¶21    Under M. R. Evid. 801(c), hearsay is a "statement . . . offered in evidence to prove the truth of the matter asserted." Hearsay statements are inadmissible unless they meet specific exceptions listed in the rules of evidence. M. R. Evid. 802. There are two ways to introduce hearsay statements: through a witness's recollection or by admitting a document as an exhibit. Additionally, M. R. Evid. 901(a) requires all evidence to be authenticated "as a condition precedent to admissibility." Testimony of a witness with knowledge is one way to authenticate the evidence. M. R. Evid. 901(b).

¶22    Lequin testified to her knowledge of these messages.

MS. SUTTON: Did [Tyler] ever make you aware of a time or make you aware that he knew [Seymour] had sent some text messages to [Smith]?

LEQUIN: Yes.

. . .

MS. SUTTON: What did he tell you in that regard?

LEQUIN: He just told me that the messages that he had sent to [Seymour], [Seymour] had forwarded to [Smith].

On re-direct examination, Lequin stated:

LEQUIN: Oh, no. I heard him tell me it himself on the phone.

MS. SUTTON: That he's the one that sent those messages?

LEQUIN: Yeah, and that he was actually thinking about suicide, that he was thinking of going to Texas and leaving the baby, changing the baby's name so I could never find the baby.

MS. SUTTON: Okay. And he said all those things to you?

LEQUIN: Well, he -- he has -- it has gotten to me, I can tell you that much, and those were sent in text messages also --

MS. SUTTON: So he --

LEQUIN: -- which was told to me. I don't know why he doesn't want me to see the baby, but --

And finally, on re-cross examination, Tyler's attorney pressed Lequin on her knowledge of these texts.

MR. FISHER: And you said that some of these allegations have gotten to you, just I assume from around town or --

LEQUIN: Yeah.

. . .

MR. FISHER: So again, your testimony is that he told you that he sent messages to his girlfriend?

9

LEQUIN: Yes.

MR. FISHER: And later, you found out about those messages just from your communications with people around town?

LEQUIN: I found out the extent of the messages later.

¶23 There are three layers of out-of-court statements in this case. First are Tyler's statements to Seymour and his statements to Lequin, which fall under the "not hearsay" exception under M. R. Evid. 801(d)(2)(A) (admission by party-opponent). Second are Seymour's statements to Smith, where she informed Smith about Tyler's comments and attached screenshots of his messages. These screenshots included Tyler's name and phone number in the heading, and one of the messages was Tyler's photo of himself and A.C.P.S. And third are the relaying statements from Smith to Lequin. Lequin never testified as to who told her about the content of the messages.

¶24 Smith did not attempt to admit the texts as an exhibit during Lequin's testimony. Instead, Lequin testified from her memory about their content. Based on her testimony, Lequin had no personal knowledge of the content of the messages. Lequin could not, therefore, testify to the content of the messages. Lequin was not a recipient of those messages, Seymour was, and Lequin was not the recipient of Seymour's forwarded messages, Smith was. Stating "it has gotten to me" and "was told to me" presents a hearsay within hearsay problem, with no exception to the outer layer of this hearsay onion.

¶25 The matter is complicated because Tyler did not object to Lequin's testimony during the hearing. At the same time, the standing master does not rely on Lequin's hearsay recitation of the Seymour messages. She relied on the messages themselves—specifically

10

referencing the ex-parte motion in the findings of fact. Which brings us to the most problematic portion of the challenged findings of fact—these messages were never admitted into the record. Because Smith never attempted to introduce these messages, she never laid a proper foundation and never met her M. R. Evid. 1002 obligation. The standing master's findings of fact surrounding these messages were clearly erroneous as they were not supported by the record.[2] *See In re G.J.A.*, ¶ 21. We also note the standing master, in Findings of Fact 31 and 32, found Tyler made suicidal threats to Lequin directly. Although he casts doubt on Lequin's credibility, Tyler does not argue on appeal this fact is erroneous, and we do not find this fact clearly erroneous.

¶26    Next, Tyler challenges the standing master's findings of fact surrounding Carpenter's testimony. Tyler argues the findings of fact were clearly erroneous because the standing master either misstated Carpenter's basis for her testimony or relied on facts not in the record to discredit Carpenter's testimony. First, Tyler objects to the standing master's finding that Carpenter did not know about Tyler's "suicidal threats" made in December 2022. At issue is the timing of the two statements made by Tyler. Tyler's messages to Seymour were sent in late December 2022, and the phone conversation Tyler had with Lequin was in early January 2023. Tyler argues the standing master was referring to the messages Tyler sent to Seymour. Tyler's reading is correct. Elsewhere in her

---

[2] The irregular method by which these messages were referenced during the hearing—without adherence to foundational requirements, the rules governing admission of exhibits, or the standing master's own evidentiary rulings—underscores the need for caution when such material becomes the basis for dispositive findings. A remand permits the District Court to ensure that any future reliance on written communications complies fully with the Montana Rules of Evidence and § 3-5-124(3)(c), MCA.

findings of fact, the standing master specifically states the Lequin phone calls occurred in January 2023. This reference makes it clear the standing master was not referring to these phone calls when she stated "threats Father made in December 2022." The standing master therefore incorporated Seymour-to-Smith hearsay evidence which was not admitted into the record. Because this fact is not supported by the record, it is clearly erroneous.

¶27 Tyler also argues the standing master omitted Carpenter's testimony about his family's history of mental illness. Carpenter testified Tyler's family history was not an indicator of Tyler's suicide risk because he did not share any of the environmental factors which increase suicide risk based on family history. Additionally, Tyler objects to the standing master discrediting Carpenter's testimony as "self-serving." Tyler argues it is irrational to conclude a mental health evaluation is not credible because the information underlying it came from the person being evaluated. Carpenter used standardized examination practices in reaching her conclusion.

¶28 The standing master has broad discretion "to assess the relative credibility of the witnesses and the weight of the evidence." *In re G.J.A.*, ¶ 12. The findings of fact "must be complete enough that this Court need not speculate when assessing the conscientiousness or reasonableness of . . . judgment." *In re D.C.N.H.*, 2020 MT 119, ¶ 15, 400 Mont. 59, 463 P.3d 445 (citation omitted; internal quotations omitted). While the standing master has broad discretion to evaluate Carpenter's credibility and weigh her testimony, she abused her discretion in discounting the entirety of Carpenter's testimony with little analysis. A standing master abuses discretion when she fails to use "conscientious judgment or exceed[s] the bounds of reason . . . ." *See In re D.C.N.H.*, ¶ 21.

12

Here, the standing master rejected the testimony solely because Tyler's statements to Carpenter were self-serving. However, this is inadequate to discard the entirety of Carpenter's testimony. Mental evaluations are inherently reliant on self-reported information. This attribute does not render self-serving statements incredible without comparative analysis of other evidence in the record. While the standing master might conclude this testimony is less persuasive than other objective evidence presented, the standing master failed to use conscientious judgment when rejecting the entirety of Carpenter's evaluation because it was based on Tyler's self-reported information.

¶29 Tyler argues the standing master erred in finding him "not entirely forthcoming" with the GAL. On cross-examination, the GAL testified Tyler never provided the GAL with his Illinois criminal record. Failure to provide a full certified criminal record could be considered as being "not entirely forthcoming" and therefore this finding of fact is not clearly erroneous.

¶30 Tyler also argues the standing master erred by rejecting the GAL's recommendation because he "did not have all the necessary information with which to make his recommendation." The GAL spent over 25 hours on the case and had extensive experience as a family law attorney. Tyler argues, just because the GAL did not review the transcript from the first day of the hearing and Tyler's criminal record, this does not mean the GAL lacked the necessary information. Smith argues the standing master's finding of fact was not erroneous because of the GAL's lack of experience, inability to review Tyler's record, heavy reliance on Carpenter's recommendations, and lack of knowledge about Tyler's parental alienation.

¶31 In addressing Tyler's assertion that the court failed to appropriately weigh and consider the GAL's recommendations, we must begin with an explanation of a guardian ad litem's duties and role in family law proceedings. A court may appoint a guardian ad litem pursuant to § 40-4-205, MCA, to "represent the interests of a minor dependent child with respect to the child's support, parenting, and parental contact." *In re Marriage of Brockington and Brown*, 2017 MT 92, ¶ 23, 387 Mont. 260, 400 P.3d 205 (quoting § 40-4-205(1), MCA). "A guardian ad litem has the general duties of informing and making recommendations to the court concerning the child's support, parenting, and parental contact following any investigation necessary to ascertain the facts relevant to such an inquiry." *In re Marriage of Brockington and Brown*, ¶ 23 (citing § 40-4-205(2)(a)-(c), MCA). However, "[t]he District Court [is] not required to adopt and follow all recommendations of the GAL." *In re Marriage of Solem*, 2020 MT 141, ¶ 23, 400 Mont. 186, 464 P.3d 981. It was within the discretion of the standing master to evaluate the GAL's testimony and adopt or reject the GAL's recommendations when determining A.C.P.S.'s best interest. "[W]e have held that judgments regarding the credibility of witnesses and the weight to be given their testimony are within the province of the District Court and we will not substitute our judgment for its determinations." *In re Marriage of Tummarello*, 2012 MT 18, ¶ 34, 363 Mont. 387, 270 P.3d 28.

¶32 Here, however, the standing master did not exercise her discretion to conclude the GAL's recommendation was not in the best interest of the child. Instead, the standing master rejected GAL's recommendation based on his perceived inexperience and inadequate basis underlying the recommendation. We find this rejection to be an abuse of

14

discretion. The GAL has extensive experience in family law as an attorney and spent a significant amount of time reviewing the case; and his recommendation was the only neutral synthesis of the parties' histories, collateral interviews, and documentary record. While the standing master may reject the recommendation, she abused her discretion when she failed to consider it.

¶33 On remand, the District Court must meaningfully engage both Carpenter's evaluation and the GAL investigation on the clean record. If the court elects to discount either, it must articulate record-supported reasons tied to § 40-4-212, MCA, rather than relying on generalized assessments of experience or self-report. This ensures the neutral professional evidence—previously overlooked—is evaluated within the statutory framework.

¶34 Tyler next objects to King's testimony about the hair follicle test performed on A.C.P.S. First, Tyler argues King could not testify "it would take approximately 7-10 days from the date of exposure for marijuana to register on a hair follicle test" because she was not an expert witness.

¶35 King was not admitted as an expert witness. King testified she was "not a certifying scientist, or a lab person, or a doctor" and was "not qualified enough to answer" questions on different exposure lengths for children and adults. Additionally, when later objecting to Tyler's offer of Carpenter as an expert, Smith's attorney admitted, "Doreen King was not qualified as an expert. I didn't seek to qualify her as an expert or introduce the drug testing results."

15

¶36    "If the witness is not testifying as an expert, the witness'[s] testimony in the form of opinions or inferences is limited to those opinions or inferences which are (a) rationally based on the perception of the witness and (b) helpful to a clear understanding of the witness'[s] testimony or the determination of a fact in issue."  M. R. Evid. 701.  In contrast, "If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education may testify thereto in the form of an opinion or otherwise."  M. R. Evid. 702.  Here, King was not testifying as to her own perception as a lay witness; her testimony was based on "what [she has] been taught."  The 7–10-day range came from her specialized knowledge or training as the owner and operator of Big Sky Drug Testing.  The standing master abused her discretion by overruling Tyler's objection to lack of foundation, and the finding of fact is clearly erroneous because King was not an expert witness.

¶37    Second, Tyler argues the lack of an admitted report into the record makes the finding of fact erroneous.  We need not reach the issue of whether a drug test result must be introduced into a record, or if testimony about the test result is adequate.  Assuming, arguendo, King's testimony on the positive result was sufficient, her testimony fails to connect the positive result to Tyler's care of A.C.P.S.  The 7–10-day range was a necessary inferential link between the positive test result and Tyler's exclusive control of A.C.P.S.  Absent this detailed date range, the standing master's ultimate finding of fact falls apart.  The finding of fact is clearly erroneous because it is not supported by the record.

¶38 We also note Lequin testified she has seen Tyler use marijuana in the presence of A.C.P.S. and A.C.P.S. smelled of marijuana when he was transferred to Lequin's care. Tyler does not object to this finding of fact, and it is not clearly erroneous.

¶39 Lastly, Tyler argues the finding of fact surrounding A.C.P.S's stay in the NICU is misleading because the finding states drug use "did not play a role in the admission of ACPS to the NICU." Tyler argues that, while drug use was not the stated reason for the admission, Dr. Kenny stated drug withdrawal symptoms "probably resulted in his continued stay in the NICU." While Tyler objects to the standing master's omission of this fact, Tyler seems to omit the very last sentence of the finding, where the standing master finds exactly that: "Because ACPS started experiencing withdrawal symptoms, he was kept in the NICU." The standing master specifically noted the extension due to drug withdrawal. The standing master's finding of fact is neither clearly erroneous, nor does it omit pertinent information.

¶40 Section 40-4-212(1), MCA, sets forth a non-exhaustive list of factors that a court must consider in determining what parenting arrangement is in the best interest of the child. *In re the Parenting of C.J.*, 2016 MT 93, ¶ 14, 383 Mont. 197, 369 P.3d 1028. Beyond the findings we find erroneous, the standing master relied predominantly on Tyler's erratic behavior towards Smith, his unstable residences, Lequin's testimony regarding Tyler's use of marijuana, and his engagement in parental alienation towards Smith. Tyler's brinksmanship and hostility displayed he was not seeking the best interest of A.C.P.S. and was not willing to co-parent with Smith.

17

¶41     While these facts support the standing master giving primary residency to Smith, they do not support the severity of the restrictions placed on Tyler. The standing master's assessment of Tyler posing a serious safety risk justified imposing a long period of supervised, incremental contact despite an undisputedly strong attachment and Tyler's prior role as primary caregiver. Once we remove this evidence, the factual foundation for such an intrusive remedy looks materially different. We are left with Tyler's documented hostility and alienating behavior, his instability and poor litigation conduct, Lequin's testimony about marijuana use and smell, and the Illinois criminal record discovery issue. Those are serious concerns, but they, standing alone, do not justify a prolonged supervised-only regime prior to the parenting plan taking effect.

¶42     Once the clearly erroneous findings are removed, the remaining record does not contain substantial, admissible evidence supporting the severity of restrictions imposed. The standing master's determination that Tyler posed a "serious safety risk" rested on findings that are now stricken, and neither the admitted testimony nor the neutral professional evaluations supply an adequate basis for a prolonged supervised-only parenting regime. Under our clear-error framework, the absence of substantial evidence supporting the most restrictive elements of the plan requires remand for a fresh assessment of the statutory best-interests factors under § 40-4-212(1), MCA.

¶43     Taken together, these evidentiary errors materially undermined the factual premises supporting the standing master's most restrictive parenting-time determinations. In summary, Findings of Fact 38 through 41, the December-timing portion of Finding of

18

Fact 44, and Finding of Fact 47 are clearly erroneous. The standing master abused her discretion by rejecting testimony of Carpenter and the GAL.

¶44 Because of these errors, we remand the case for the District Court to reassess the § 40-4-212(1), MCA, factors without reliance on these stricken findings; address the weight given to Carpenter's evaluation and GAL's report; and impose a new or modified parenting plan which is in the best interest of A.C.P.S., unless new or additional evidence justifies continuing strict limitations.

¶45 We have determined to decide this case pursuant to Section I, Paragraph 3(c) of our Internal Operating Rules, which provides for memorandum opinions. In the opinion of the Court, the case presents a question controlled by settled law or by the clear application of applicable standards of review.

/S/ CORY J. SWANSON

We Concur:

/S/ JAMES JEREMIAH SHEA
/S/ KATHERINE M. BIDEGARAY
/S/ BETH BAKER
/S/ LAURIE McKINNON

19