No. 88-571

IN THE SUPREME COURT OF THE STATE OF MONTANA

1990

_____

IN THE MATTER OF DECLARING
S.P., C.P., H.M., J.M., K.M.,
Y.M., Youths in need of care.

_____

APPEAL FROM:    District Court of the Fourth Judicial District,
                In and for the County of Missoula,
                The Honorable James B. Wheelis, Judge presiding.

COUNSEL OF RECORD:

    For Appellant:

        James P. O'Brien, (C.M.-Natural Father), Missoula,
        Montana
        Christopher Daly, (B.N.-Grandmother), Missoula, Montana

    For Respondent:

        Hon. Marc Racicot, Attorney General; Kathy Seeley,
        Asst. Atty. General, Helena, Montana
        Robert L. Deschamps, III, County Attorney; Diane
        Conner, Deputy, Missoula, Montana
        William Boggs, (Guardian Ad Litem), Missoula, Montana
        Kristine Davenport, (Intervenors J.K. & N.K.), Missoula,
        Montana
        Paulette Ferguson, (J.R.-Grandmother), Missoula, Montana
        Morgan Modine, (Intervenor J.S.), Missoula, Montana

_____

                        Submitted:  December 1, 1989

                          Decided:  February 1, 1990

Filed:

_____
                        Clerk

Justice John Conway Harrison delivered the Opinion of the Court.

This matter comes to us on appeal from a Missoula County District Court decision in which the parental rights of the natural father, C.M. were terminated. After finding H.M., J.M., Y.M., and K.M., youths in need of care, Judge Wheelis in his August 31, 1988 order, declared the parent-child relationship between C.M. and his four small children terminated, awarding permanent custody to the Department of Family Services (Department). The children were ordered permanently placed with foster parents J.K. and N.K. The Department, in consultation with the Ks and the children's Guardian Ad Litem, was granted the right to supervise or restrict contact between the children and C.M. and other relatives.

The maternal grandmother, B.N., also appeals the District Court order. She alleges that the District Court abused its discretion when it awarded permanent custody to the Ks rather than herself.

We find the District Court's order to be in the best interests of the children and, therefore, we affirm.

C.M., the natural father, presents two issues:

> 1. Did the District Court have subject matter jurisdiction to declare the M children dependent youths within the meaning of Montana's child abuse, neglect and dependency statutes?

> 2. Do the best interests of the M children require termination of C.M.'s parental rights?

B.N., the maternal grandmother, presents three additional issues:

> 1. Did the District Court abuse its

2

discretion in not awarding permanent custody to the maternal grandmother?

2. Should § 41-3-406, MCA, be interpreted to give relatives priority over non-relatives in custody proceedings?

3. Does permanent placement with concomitant governmental support of the Ks as foster parents violate the First Amendment to the United States Constitution?

The natural mother, D, was first married to J.P., by whom she had a daughter, S.P. and a son, C.P. After divorcing her first husband, D married C.M. and the couple had the four children at issue in this case: H.M., J.M., Y.M. and K.M. During this marriage C.M. was convicted of sexually abusing D's daughter from her first marriage. C.M. served over two years in the Oregon State Penitentiary for that crime. D subsequently divorced C.M. and began living with J.S. It is not clear from the record whether D and J.S. were actually married.

J.S. and D and her six children from her two previous marriages eventually moved to Missoula, Montana. On or about October 24, 1986, D was killed and J.S. later confessed to murdering her.

The State, through the Department, placed the four M children in a Missoula receiving home since their natural father was in prison, their natural mother was dead, and their stepfather had confessed to murdering her. The two older children, S.P. and C.P., were eventually returned to their natural father, J.P., in California.

As is the normal procedure, the Department began legal

3

proceedings to obtain temporary investigatory authority (TIA) and protective services. At the first hearing held in mid-November, 1986, the Department orally moved to amend the TIA, asking that the children be declared youths in need of care and that the Department be given temporary legal custody. Several parties were represented: Montana Social and Rehabilitative Services (of which the newly-named Department of Family Services is now a part) requested temporary investigative authority for the purpose of determining immediate temporary disposition and eventual permanent placement of the four M children; an attorney acting as the children's Guardian Ad Litem; B.N., the maternal grandmother from Arkansas requesting custody of the four M children; J.K. and N.K., of Florence, Montana, interested parties and friends of the deceased mother, D, requesting custody of the four M children; J.S.R., C.M.'s mother and the children's paternal grandmother from Missouri, also requesting custody; C.M., the children's natural father who came from Oregon to ensure his parental rights continued; and J.S., the stepfather. Later, D's sister and the children's aunt, J.R., also sought custody, but eventually joined in asking that her mother, B.N. (maternal grandmother), be given the children.

Following the November 1986 hearing, Judge Wheelis declared the four M children to be youths in need of care and temporarily placed the children with the Ks.

On August 18 and November 13, 1987, the court held a separate hearing in order to put a treatment plan in place for C.M. In

4

accordance with Part 6, Chapter 3 of Title 41, regarding termination of the parent-child legal relationship, the treatment plan for C.M. was approved by the court. C.M. began but did not finish Phase I of the treatment plan.

After the final hearing held in June and July of 1988, permanent custody of the children was given to the Department, permanent placement granted to the Ks, and C.M.'s parental rights terminated in an August 1988 order. These determinations resulted from five days of hearings with testimony from many witnesses, ranging from medical experts to the parties themselves, and a plethora of exhibits.

Of the several parties only two appeal. C.M. appeals that part of the order terminating his parental rights and the maternal grandmother appeals the fact she was awarded neither permanent custody nor permanent placement of the children. Additional facts will be discussed as necessary.


STANDARD OF REVIEW

The same standard of review applies to both termination of parental rights and custodial determinations. In both instances the District Court's decision is afforded "all reasonable presumptions as to the correctness of the determination" and therefore such decision will not be disturbed on appeal "unless there is a mistake of law or a finding of fact not supported by substantial credible evidence that would amount to a clear abuse of discretion." In the Matter of R.A.D. (Mont. 1988), 753 P.2d

862, 865, 45 St.Rep. 496, 499.

Thus, regarding both C.M.'s parental rights' claims and the maternal grandmother's custody objections, we apply the same standard of review. That is, we presume the District Court's determinations on both matters to be correct, unless such determinations are not supported by credible evidence.

ISSUE I:   Subject matter jurisdiction

C.M. contends that the District Court did not have subject matter jurisdiction to declare the M children dependent youths within the meaning of the child abuse, neglect and dependency statutes. These statutes are found in Chapter 3 of Title 41, MCA.

C.M. bases his argument on the fact that certain procedural irregularities occurred. Initially, C.M. appeared pro se, and the District Court denied his request for a court-appointed attorney. At this preliminary hearing held November 14 through November 19, 1986, the Department requested temporary investigative authority and a determination of temporary disposition of the M children. On the second day of the November, 1986, hearings, the District Court permitted the Department to amend the pleadings. The amendments asked that the M children be declared youths in need of care under § 41-3-102(10), MCA, and that the Department be granted temporary legal custody of the children. At that time no objection was made and the court granted the amendments.

On the third day of the hearing C.M. acknowledged that the court had authorized an attorney to help prosecute the case.

However, the attorney refused to be entered as attorney of record since two days of testimony had already taken place. On his own, C.M. made two objections stating, "[I] understand that there would have been a question of personal judgment, parental jurisdiction, that I have raised in this matter if I would have known of it -- if I would have known or if I would have had an attorney. The second matter of question is of service and time." C.M. objected to the lack of personal service he received and the fact that he had only four days rather than five to appear and respond.

The court treated C.M.'s objections as a motion to stay proceedings and refused it. Testimony continued. The result of the hearing was that the M children were declared youths in need of care and temporarily placed with the Ks, with temporary custody vested in the Department. The Department received temporary investigative authority, and C.M. was granted limited contact with the children subject to the Department's supervision and restrictions.

Another hearing was held on August 17, 1987 in which the Department brought two motions, one seeking approval of a treatment plan for C.M. and a second for change in custody. C.M. was represented by counsel at this juncture. The hearing was continued until November 13, 1987. When asked if he would continue to seek custody of his children, C.M. replied:

> I have to answer this very honestly. I think until I go through this program and I get the psychiatric treatment which I need, I don't know that the children being with me permanently is any answer right now. They are loved. They are taken care of. They are

disciplined. They have a home environment [with their foster parents].

Although C.M.'s subject matter jurisdiction argument is hard to follow, he seems to base his claim on two allegations. First, the State's service on him was defective and resulted in improper notice. Second, by allowing the Department to orally amend their pleadings, the District Court was deprived of subject matter jurisdiction.

We first examine the question of service. According to his own testimony, C.M. was personally served in Oregon by his parole officer. Under the Montana Rules of Civil Procedure this is a perfectly acceptable means of obtaining out-of-state personal service. Rule 4D (3), M.R.Civ.P., provides that service on a person outside this State may be made in the manner provided for service within the State. Rule 4D (1)(a) provides that such service be made by any "person over the age of 18 not a party to the action." C.M.'s parole officer who made the service is over 18 and not a party to the action. Service of process is sufficient.

C.M.'s complaint that the service did not allow him the five days' notice to which he was entitled has little merit. The show cause order was served on C.M. on Friday, November 7, 1986, and the show cause hearing was set for November 14, 1986. Because Tuesday, November 11, 1986 was a legal holiday, C.M. did not receive five days' notice of the hearing on the abuse, neglect or dependency petition as required by § 41-3-401(4), MCA. While it is true C.M. received one day less than the statutorily required notice, he was

not substantially harmed by the error. This is evidenced by the fact that he was able to attend the hearing and represent his interests there.

This Court has previously refused to overturn a judgment where failure to give proper notice did not prejudice the appealing party. See Williams v. Superior Homes, Inc. (1966), 148 Mont. 38, 417 P.2d 92. Obviously, C.M. was not prejudiced by receiving four rather than five days' notice. "[L]ack of notice does not automatically entitle a party to relief, but is a consideration to be weighed by the court in exercising its discretion." In re Marriage of Neneman (1985), 217 Mont. 155, 160, 703 P.2d 164, 167.

In addition, this was a temporary custody hearing not the final permanent custody hearing. Such procedural defects in a temporary custody hearing do not invalidate subsequent permanent legal custody proceedings. Matter of M.E.M. (1984), 209 Mont. 192, 196, 679 P.2d 1241, 1243.

Turning to the issue of the oral amendments, we find appellant's argument to be completely without merit. Again, C.M.'s argument lacks clarity. Rather than restating C.M.'s indiscernible allegations regarding lack of subject matter jurisdiction caused by the court's allowing oral amendments to the petition, suffice it to say we find that the District Court followed the statutory scheme. By following the statutory scheme, the court did properly obtain subject matter jurisdiction and such jurisdiction did continue throughout the proceedings.

This action was originally filed on October 21, 1986, as a

Petition for Temporary Investigative Authority and Protective Services under the provisions of Chapter 3, Title 41, MCA. The petition was brought by the Missoula County Attorney's office and stated, in compliance with § 41-3-401, MCA, the four children were abused, neglected or dependent or in danger of becoming abused, neglected or dependent. The petition was supported by an affidavit sworn by a social worker from the Missoula County Office of Human Services and a Report to the Court containing pertinent information, including the full names, ages and addresses of the children and the names and addresses of their parents; the names and addresses of all persons who were necessary parties to the action along with their relationships to said children; and the nature of the alleged abuse, neglect or dependency. This conforms to the requirements of § 41-3-401(9), MCA, as the two accompanying documents were incorporated by reference into the petition. The petition asked for temporary investigative authority and protective services of the Department, that the court order a show cause hearing, that a guardian ad litem be appointed for the children, and any other relief the court might in its discretion order. Section 41-3-401(10), MCA.

Upon receipt of the petition Judge Wheelis, acting in accordance with § 41-3-401(2), MCA, set a date for an adjudicatory hearing on the petition. The hearing, labeled a show cause hearing, was set for Friday, November 14, 1986. This was within the mandatory twenty days as prescribed by the section at that time. (The requirement that an adjudicatory hearing be held within

10

twenty days of filing of the petition has since been amended out of § 41-3-401(2), MCA.)

As discussed above, C.M., as a parent, received notice of the hearing, albeit only four days' notice, in accordance with § 41-3-401(4), MCA. At the same time the petition was filed, the date for the adjudicatory hearing was set and notice was sent to C.M., thus meeting all pertinent provisions of § 41-3-401, MCA.

Section 41-3-402, (1985) MCA, which dovetails with § -401, sets out the criteria for a petition for temporary investigative authority and protective services. Again, all provisions of § 41-3-402, MCA, were met: the county attorney filed a petition for temporary investigative authority and protective services (subsection (1)); the petition specifically stated the authority requested and the facts establishing probable cause were set out (subsection (2)); and the petition was supported by the above-mentioned Report to the Court (subsection (3)).

Upon the Missoula County Attorney's filing of the petition for temporary investigative authority and protective services, the Missoula District Court issued an order granting the relief necessary for immediate protection of the M children, in accordance with the provisions of §41-3-403(1)(a), MCA. The order provided for a show cause hearing within twenty days, as required by §41-3-403(1)(c), MCA, and was served in accordance with §41-3-403(1)(b), MCA. Furthermore, the court granted relief in substantially the same form as provided for in subsection (2) of § 41-3-403, MCA, thus meeting all requirements of the statute.

11

Obviously, both the County Attorney and the District Court adhered very closely to the law in presenting the petition and issuing the order.

On November 14-19, 1986, the adjudicatory hearing was held, resulting in temporary disposition of the children to the Ks. Again, the provisions of the statute controlling such proceedings, § 41-3-404, were strictly followed.

On the second day of this hearing the county attorney moved to orally amend the petition, asking that the M children be declared youths in need of care as dependent youths under § 41-3-102(10), MCA, and that the Department be granted temporary custody of the children. No objections being heard at the time, the judge granted the motion to amend. At the conclusion of the hearing, both requests in the motion were granted by Judge Wheelis.

Eleven months later, C.M. moved for a new trial, or, in the alternative, that Judge Wheelis' December 15, 1986 Findings of Fact and Conclusions of Law be amended, striking all references to the children as dependent youths. C.M. argued then, as he does now, that the petition for temporary investigative authority and protective services does not contemplate or provide for adjudication of allegedly abused, neglected or dependent children, and by allowing the two above-mentioned oral amendments the District Court somehow did not have subject matter jurisdiction. Now, as then, the argument's logic fails.

Section 41-3-401(11), MCA, clearly states that abuse, neglect and dependency petitions "may be modified for different relief <u>at</u>

any time within the discretion of the Court." (Emphasis added.) In allowing the oral modification of the petition, the court properly availed itself of the discretion granted by the statute.

Moreover, Rule 15(b), M.R.Civ.P., allows amendments of the pleadings to conform to the evidence, and Montana case law supports this rule. This Court has upheld amendments made on the day of trial and even during trial. See, for example, Kearns v. McIntyre Construction Co. (1977), 173 Mont. 239, 567 P.2d 433 and Keaster v. Bozik (1981), 191 Mont. 293, 623 P.2d 1376.

C.M.'s claim that by allowing the oral amendments the court deprived him of his right to demand that the State prove by clear and convincing evidence that the children were abused, neglected or dependent is completely without merit. The oral amendments did not prejudice C.M.: the Department's theory was not changed, the facts noticed in the pleading were not changed, and the type of relief requested did not change. It must be remembered that this was only the adjudicatory hearing. For the children's well-being it was essential that the court make a temporary disposition as quickly as possible. By going ahead with the hearing on the petition as orally modified the court was able to act in the best interests of the children. Final dispositional hearing was not held until June 27, 1988, over a year and half after the adjudicatory hearing, giving C.M. ample time to dispute and present evidence that his children were abused, neglected or dependent.

The record is replete with evidence that the children were indeed abused, neglected and dependent within the clear meaning of

13

the statute. C.M. himself testified at the final dispositional hearing that he favored permanent legal custody with the Ks. There is no reason to believe that the trial court abused its discretion and the orders issued in this case will stand.

ISSUE II: Termination of C.M.'s Parental Rights

C.M. argues that the best interests of the children do not require termination of his parental rights. In support of this argument C.M. points to limited instances in the transcript where the foster mother testified she would have no objection to C.M. having supervised contact and a psychologist testified that some contact between the children and their natural father would pose little risk to the children.

However, the child psychologist who counseled the four M children recommended no visitation between C.M. and the children. The child psychologist stated that terminating C.M.'s rights would help the children and it would be in their best interests to allow the Ks to adopt them. C.M.'s evaluating psychologist also stated terminating C.M.'s parental rights may, in the long run, be beneficial to C.M.

Once again there is substantial, credible evidence to support the District Court's finding of fact that it is in the children's best interests that C.M. not have the right to visit or contact the children. Therefore, we will not overturn the decision on appeal.

ISSUE III: Not Awarding Custody to the Maternal Grandmother and Status of the Current Law

14

B.N., the maternal grandmother, argues that the District Court abused its discretion by not awarding her permanent custody of the children. B.N. asserts that the District Court's findings of fact on this issue are clearly erroneous because the findings concerning her were based almost solely on the opinions of a witness who had no firsthand knowledge of B.N. and who admitted she relied almost totally on the "bad press" reported by B.N.'s adversaries. We find this assertion to be totally without foundation.

Contrary to B.N.'s allegations, most of the District Court's findings pertaining to her were established by her own testimony, not by the expert she claims the court relied on almost exclusively. B.N. herself testified that she is 65 years old, divorced and diabetic; that she completed only the 8th grade in school with some additional training later in life; and that each of her nine children quit school before graduating and that several left home before age sixteen. Other of the District Court's findings of fact were established by other witnesses. For example, B.N.'s failure to keep promises and making inappropriate comments to the children was testified to by N.K., the children's foster mother.

Again, there was substantial credible evidence to support the District Court's findings that it was in the best interests of the children to place them with the Ks rather than the maternal grandmother. There is no abuse of discretion.

B.N. next argues that the current law not giving relatives priority over nonrelatives should be reversed. The controlling

statute in this matter states that following the dispositional hearing the court may "[t]ransfer legal custody to . . . a relative or any other individual who . . . is found by the court to be qualified to receive and care for the youth . . . " Section 41-3-406, MCA.

This Court has often upheld custody given to nonrelatives over relatives, and in all cases, the paramount consideration is the best interests of the children. Matter of M.N. (1982), 199 Mont. 407, 410, 649 P.2d 749, 751, and cases cited therein. Moreover, "[A] grandmother does not, by virtue of her status as a grandparent, have any superior right of adoption or custody to that of a nonrelative." Matter of M.N., 199 Mont. at 409, 649 P.2d at 750.

Appellant B.N. is asking us to overrule our previous line of cases and to assume the legislative function of rewriting the statute. We will do neither. Section 41-3-406, MCA, and the cases interpreting it are good law. As noted in Matter of M.N., the section is not mandatory but gives discretion to the district court whether to award custody to a relative. Matter of M.N., 199 Mont. at 410, 649 P.2d at 751.

### ISSUE IV: Placement of the Children with Christian Foster Parents

Lastly, B.N. contends by placing the children with the Ks, who maintain their own ministry, the State violated the establishment clause of the First Amendment prohibiting government support of religion. As with her other arguments, B.N.'s position is

16

untenable.

The United States Supreme Court set forth the standard to determine whether state aid constitutes the establishment of religion in Lemon v. Kurtzman (1971), 403 U.S. 602, 91 S.Ct. 2105, 29 L.Ed.2d 745. According to the three-prong test delineated in Lemon, state aid is constitutional if: (1) it has a secular purpose, (2) its primary effect neither advances nor inhibits religion, and (3) it does not foster excessive government entanglement in religion. Lemon, at 612-13, 91 S.Ct. at 2111, 29 L.Ed.2d at 755.

Here, the aid provided to the Ks for foster care meets all three requirements of the Lemon test. First, its purpose, to provide parental care for the M children is clearly secular. Second, the primary effect of the foster care placement and attendant payments is that the children now have a safe, loving and secure home and parents, which does not advance nor inhibit religion. Third, the placement and payments do not excessively entangle the State in religion. As the Department's social worker testified, the State makes foster care payments to foster parents to reimburse their expenses. Foster parents, whether ministers or not, may then do as they wish with that money and do not have to account for the money. Placement with and payment to the Ks for foster care of the four M children in no way violates the First Amendment.

We affirm the decision of the District Court.

17

_(signature)_ Harrison
Justice

We concur:

_(signature)_ William E. Hunter

_(signature)_ John C. Sheehy

_(signature)_ R. C. McDonough

_(signature)_
Justices

18