FILED

07/12/2016

*Ed Smith*
CLERK OF THE SUPREME COURT
STATE OF MONTANA

Case Number: DA 15-0559

DA 15-0559

# IN THE SUPREME COURT OF THE STATE OF MONTANA

## 2016 MT 164

IN THE MATTER OF THE
PARENTING OF Z.D.L.-B.,

JESSICA JEANNE JOHNSON, fka
JESSICA JEANNE LAWRENCE,

        Petitioner and Appellant,

   v.

DANIEL WILLIAM BATEY,

        Respondent and Appellee.

| | |
|---|---|
| APPEAL FROM: | District Court of the First Judicial District, In and For the County of Lewis and Clark, Cause No. ADR-2005-27 Honorable Mike Menahan, Presiding Judge |

COUNSEL OF RECORD:

      For Appellant:

           Alice J. Hinshaw, Michelle H. Vanisko, Hinshaw Law Firm, PLLC, Helena, Montana

      For Appellee:

           Roberta Cross Guns, Attorney at Law, Ulm, Montana

                           Submitted on Briefs: June 8, 2016

                                 Decided: July 12, 2016

Filed:

                                                  Clerk

Justice Jim Rice delivered the Opinion of the Court.

¶1     Z.D.L.-B. (referred to herein simply as "Z") is the 12-year-old son of Jessica Jeanne Johnson (Jessica), and Daniel William Batey (Daniel). Jessica appeals the Findings of Fact, Conclusions of Law, and Final Parenting Plan entered by the First Judicial District Court, Lewis and Clark County. The Final Parenting Plan named Daniel as the primary care provider, after Jessica had been Z's primary provider. We affirm and address the following issues:

> *1. Did the District Court err by modifying the parenting plan because changed circumstances did not exist to justify modification of the existing parenting plan?*
>
> *2. Were the District Court's findings of fact related to Z's best interests clearly erroneous?*
>
> *3. Did the District Court err in denying Jessica's request for attorney fees and costs?*

### FACTUAL AND PROCEDURAL BACKGROUND

¶2     Z was born in 2003 to Jessica and Daniel, who were then both in high school. From birth, Jessica was the primary care provider for Z, with assistance from Daniel and their respective families. Jessica and Daniel did not marry and, after their romantic relationship ended, the parties managed to parent Z without significant court intervention. Jessica petitioned for a parenting plan in 2005, and the court adopted a Stipulated Parenting Plan. In 2007, the parents filed a Stipulated First Amended Parenting Plan (referred to herein as the "Amended Plan"), which was also adopted by the court. It remained in force until the events described below.

2

¶3 The Amended Plan provided that Z would reside primarily with Jessica, while spending alternating weekends, designated holidays, and birthdays with Daniel, "regardless if the parents are living in the same community or not." Both parties acknowledge that, while they adhered more or less to the Amended Plan, they were flexible in the time each would spend with Z.

¶4 After both parties attended Helena College of Technology, Daniel moved to Missoula in 2006. In 2008, shortly after the Amended Plan was adopted, Jessica moved to Butte with Z, who attended school there until 2011. In 2011, Jessica moved to Wise River, and Z attended school there. Jessica moved to the Missoula area in 2012, finding a place to live in Frenchtown. Z attended Target Range Elementary School in Missoula for a time, until Jessica started to homeschool him. The homeschooling period did not last long, and thereafter, Z attended the Frenchtown public schools until October 2014. During the time that both parties lived in the Missoula area, Daniel began exercising more time with Z, in excess of the time provided in the Amended Plan.

¶5 By the fall of 2014, Daniel had moved back to Helena, and was working there. Although the parties hotly contest the characterization of the transfer of Z that took place in Helena, a simplified version is as follows: Jessica decided to move back to Helena, and asked Daniel if Z could live with him in anticipation of her relocation to the area. Daniel, taking this request to mean that Z would live with him for the remainder of the school year, agreed, and enrolled Z at Hawthorne Elementary School in the fall of the 2014-2015 academic year. Jessica maintains that both parties understood that Z would live with Daniel only through the end of the current semester, stating: "So it was my

3

intention that, at winter break, I would retrieve [Z] and put him in school wherever I decided to live at that time." Upon her move to Helena, Jessica initially lived with her father, who resided within the city limits, while she was looking for employment.

¶6 An incident occurred on November 18, 2014, at Hawthorne Elementary School. Daniel had set up a meeting with Z's fifth grade teacher to discuss Z's progress and needs, and informed Jessica, who declined to attend the meeting because Daniel's girlfriend was going to be there. Nonetheless, the parties agreed that Jessica could pick up Z early from school that day in order to have dinner with him.

¶7 Before the scheduled parent-teacher meeting began, Jessica arrived at the school and found Z outside of his classroom with his teacher. Jessica approached the teacher, who asked her some identifying questions. Jessica informed the teacher who she was, that she was there to pick up Z, and that she wasn't sure she wanted Z to continue attending school there. School officials did not recognize Jessica because she was not registered with the principal's office, and therefore were reluctant to release Z to her care. Jessica became angry, and school officials called law enforcement and Daniel to respond at the school. The situation eventually de-escalated, and Jessica left the school with Z.

¶8 However, Jessica then withdrew Z from enrollment at Hawthorne School, and contacted Rossiter Elementary School and Jim Darcy Elementary School about possible enrollment of Z. Ultimately, Z was not enrolled at either school, because several days later, Jessica moved from Helena to Wolf Creek to live with her mother. The District Court found that "[a]fter several days in which [Z] did not attend school and/or was unaware which school he would eventually attend, Jessica enrolled [Z] in the Wolf Creek

4

School . . . ." Jessica admits that she did not consult Daniel about removing Z from Hawthorne School or about enrolling him at the Wolf Creek School, because she felt she was "within [her] right in the parenting plan."

¶9 On November 19, 2014, the day after the incident at Hawthorne School, Daniel filed a pro se emergency Motion to Amend the Amended Plan. After obtaining counsel, he filed a Renewed Motion to Implement Interim Parenting Plan, supported by affidavits, on December 15, 2014. Daniel's basis for his motion was that the Amended Plan was "outdated and irrelevant to our current circumstances[,]" and that Jessica's multiple moves and frequent changes in schools, especially in light of the most recent incident at Hawthorne School, were disruptive to Z's stability. Daniel's proposed parenting plan named him as the primary residential parent. The District Court appointed a guardian ad litem for Z on December 19, 2014, and conducted a hearing on August 10, 2015, taking testimony from both parents, the guardian ad litem, Z's fifth grade teacher at Wolf Creek, and Z's maternal grandmother. Jessica testified that she had moved into a house she had purchased in Dearborn in May 2015, and was hoping to enroll Z in the Cascade County School. Jessica indicated that she had toured the school with Z, and had given him the impression that he would be attending that school in the upcoming fall as a sixth grader.

¶10 The District Court entered its Findings of Fact, Conclusions of Law, and Final Parenting Plan on August 14, 2015, naming Daniel as the primary residential parent and providing that Jessica would have parenting time every other weekend and designated holidays, and for alternating three-week periods in the summer. Jessica appeals.

5

**STANDARD OF REVIEW**

¶11 Jessica argues on appeal that the District Court modified the Amended Plan without first making a finding of changed circumstances, as required by § 40-4-219(1), MCA. "[W]here the allegation is that the district court made no such [required] findings in the first place and the issue is whether the court's action conforms to statutory requirements, we are presented with a question of law, which we review *de novo*." *Jacobsen v. Thomas*, 2006 MT 212, ¶ 13, 333 Mont. 323, 142 P.3d 859 (citing *In re T.H.*, 2005 MT 237, ¶ 35, 328 Mont. 428, 121 P.3d 541).

¶12 Jessica argues on appeal that the District Court's findings of fact are clearly erroneous.

> We review the findings in support of a district[] [court's] decision to modify a parenting plan under the clearly erroneous standard. Conclusions of law are reviewed for correctness, and we will only reverse a district court's decision where an abuse of discretion has been clearly demonstrated. In other words, a district court's decision "will not be disturbed on appeal unless there is a mistake of law or a finding of fact not supported by substantial credible evidence that would amount to a clear abuse of discretion." The test for abuse of discretion is whether the trial court acted arbitrarily without employment of conscientious judgment or exceeded the bounds of reason resulting in substantial injustice.

*Guffin v. Plaisted-Harman*, 2010 MT 100, ¶ 20, 356 Mont. 218, 232 P.3d 888 (quoting *In re S.P., C.P., H.M., J.M., and Y.M.*, 241 Mont. 190, 194, 786 P.2d 642, 644 (1990)) (citations omitted).

DISCUSSION

¶13    *1.  Did the District Court err by modifying the parenting plan because changed circumstances did not exist to justify modification of the existing parenting plan?*

¶14    Jessica argues that, because the District Court failed to make a specific finding that a change in circumstances had occurred, the court did not have jurisdiction to modify the parenting plan.

¶15    Section 40-4-219(1), MCA, provides:

> The court may in its discretion amend a prior parenting plan if it finds, upon the basis of facts that have arisen since the prior plan or that were unknown to the court at the time of entry of the prior plan, that a change has occurred in the circumstances of the child and that the amendment is necessary to serve the best interest of the child. . . .

¶16    Jessica correctly notes that the District Court did not enter a finding expressly addressing a "change in circumstances."  While it is preferable that district courts enter such a finding, and we urge courts to do so, we have previously held that this omission does not necessarily constitute reversible error.  *In re Marriage of Burk*, 2002 MT 173, ¶ 11, 310 Mont. 498, 51 P.3d 1149.  Here, the District Court made a number of findings demonstrating that a change in circumstances had occurred, including noting the guardian ad litem's "greatest and over-riding concern for [Z] is that he has been subjected to numerous disruptions in his social and educational development precipitated by Jessica's frequent moves."  The District Court also found that "[i]n recent years Daniel grew concerned that [Z] was experiencing difficulty adjusting, as evidenced by his educational performance in the classroom."  Although the District Court did not use the language of the guardian ad litem—that "[s]ix schools, in six towns, in six years is [sic] too much"—

the point it made was nonetheless the same. We are satisfied that the District Court sufficiently supported its decision to modify the Amended Plan with findings indicating that changed circumstances existed that required review and consideration of a modification of the parenting plan.

¶17 Jessica points to language of the Amended Plan that "makes it clear that the parties anticipated that one or both of them may move and specifically provided for that possibility. Because the [Amended] Plan contemplated that the parties might move when it was adopted by the district court, moving is not a changed circumstance." She further argues that because the parties agreed on changes in Z's schooling, such changes do not constitute a change in circumstance.[1]

¶18 This Court recognizes that parents move and that children need to change schools as a family relocates. These circumstances arise commonly. Parenting plans may even contemplate a future change in schools for a child. *See, e.g., In re Whyte*, 2012 MT 45, 364 Mont. 219, 272 P.3d 102. Such changes do not, by themselves, constitute a change in circumstances necessitating an amendment to an existing parenting plan. *See Ramberg v. Massey (In re C.M.R.)*, 2016 MT 120, 383 Mont. 398, ___ P.3d ___. However, if moving occurs in a manner that becomes disruptive to the child or to the functioning of the parenting plan, it may constitute a change in circumstances requiring review of the plan.

---

[1] Jessica argues that "most of these [school] transfers were agreed to by Daniel," but her testimony indicates she also initiated changes in Z's schools without consulting Daniel: "I mean, I'd also enrolled [Z] in schools before that I had informed Daniel this is where I live. This is the school he's going to attend. And it was not whether he was in agreement or not. It was just – I informed him. And he was like, okay. So it's the past."

8

¶19 Here, the District Court heard testimony outlining Z's multiple changes in living arrangements and school enrollments over the years. The court heard Daniel's testimony that "I've had these concerns that I've talked about for a number of years. . . . Mainly him moving around and having, you know, difficulties definitely socially. I mean, [Z] has had very few friends in his life." The guardian ad litem testified that "it's perplexing to me the number of times that Jessica's chosen to change his [Z's] educational environment. That really was my primary concern[,]" and that "I just think the constant moving is so hard on [Z]." Thus, there was evidence to support the District Court's findings that Z had experienced detrimental effects from the number of moves and changes in schools, necessitating review of the parenting plan.

¶20 Finally, Jessica argues that the District Court did not explicitly address whether the Amended Plan was "outdated," as Daniel alleged in his motion for modification. However, Jessica acknowledged in her pleadings to the District Court that "the current parenting plan needs to be revised," consistent with our determination here that there was a sufficient showing of a change in circumstances to consider modifying the parenting plan.

¶21 *2. Were the District Court's findings of fact related to Z's best interests clearly erroneous?*

¶22 Jessica argues that the District Court's findings of fact were clearly erroneous, claiming that "the record as a whole does not support the [D]istrict [C]ourt's findings." We address Jessica's specific contentions in turn.

*a. Z was experiencing difficulty adjusting to school.*

¶23    Jessica argues that "[t]here was simply nothing in the record upon which the [D]istrict [C]ourt could have reasonably concluded" that Z's school performance was suffering due to Jessica's parenting or living situation. We disagree. The record includes testimony from Z's fifth grade teacher at Wolf Creek School, who testified that when Z was first enrolled, she gave him an academic assessment. Although acknowledging Z's reading strength, she testified, "But in math, I definitely saw he was pretty far behind." Jessica also testified that Z was experiencing difficulty in math, and had been recommended for extra tutoring "to prepare [him] for 6th grade." Jessica testified that Z would forget homework tasks and assignments, despite the use of a planner. There was substantial credible evidence to support the District Court's finding that "[Z] was experiencing difficulty adjusting, as evidenced by his educational performance in the classroom." *See Guffin*, ¶ 20.

*b. It was not in Z's best interest when Jessica removed him without warning from Hawthorne Elementary School.*

¶24    Following a detailed discussion of the November 18, 2014 incident where Jessica removed Z from Hawthorne School and enrolled him in Wolf Creek School several days later, the court found: "Although Jessica is an involved and attentive parent, it was not in the best interest of [Z] to remove him from attending Hawthorne Elementary School without a fixed residence, secure employment, and a school prepared to admit him." Jessica argues that "[t]here are no facts on the record to support any of these findings." Again, we disagree. At the hearing, Jessica's counsel asked her why she didn't

immediately enroll Z at the Wolf Creek School after removing him from Hawthorne School, but rather first contacted two other elementary schools. She answered, "Because I was still, you know, I was, kind of, temporarily living at my dad's house. . . . As well as I was still hunting for a job." There was substantial credible evidence before the District Court to support its finding. *See Guffin*, ¶ 20.

### c. Daniel is better equipped to provide a stable environment for Z.

¶25 Jessica argues the District Court erred "in modifying the [Amended] Plan on the basis that Daniel was better equipped to provide a stable environment for Z." Choosing which parent will provide the healthiest environment for a child is a difficult decision for a court. "We have specifically recognized the District Court's broad discretion when considering the parenting of a child. 'Child custody cases often present the court with difficult decisions. We must presume that the court carefully considered the evidence and made the correct decision.'" *In re Marriage of Tummarello*, 2012 MT 18, ¶ 34, 363 Mont. 387, 270 P.3d 28 (citing *Hilliard v. Smith (In re Parenting of N.S.)*, 2011 MT 98, ¶ 18, 360 Mont. 288, 253 P.3d 863). The decision here was no doubt a difficult one for the District Court. However, Jessica fails to account for the evidence offered by the guardian ad litem's report that when Z was first enrolled at Hawthorne, his teacher reported that he "was guarded as the new kid in class, but that Dan[iel] made several successful efforts to create opportunities for socialization." The guardian ad litem also noted that she had spent several hours with Z and Daniel, and "observed a tender, patient relationship." Jessica's recent actions causing disruption clearly contrasted with evidence of Daniel's calming effect. Although Jessica strongly disagrees with the District Court's

11

findings, the court relied upon this evidence in finding that Daniel was better equipped at this time to provide a stable environment for Z, and we will defer to its discretion. *See Tummarello*, ¶ 34.

¶26     Jessica also argues generally that the District Court's August 2015 Final Parenting Plan is not in Z's best interest. Section 40-4-212(1)(a)-(m), MCA, lists relevant factors for a district court to consider when determining the best interest of a child. The District Court did not address the factors in an itemized fashion, but as we have previously stated, "The statute lists many factors for the district court to consider in its determination of a child's best interest, and although it need not make specific findings pertaining to each factor, a district court must consider the guidelines in the statute." *In re Marriage of Baer*, 1998 MT 29, ¶ 19, 287 Mont. 322, 954 P.2d 1125 (citing *In re Marriage of DeWitt*, 273 Mont. 513, 516, 905 P.2d 1084, 1086 (1995)). The District Court did make detailed findings regarding the difficulty that Z had with adjusting, as evidenced by a struggling academic performance,[2] the environment and relationship that Daniel fostered while Z was living with him,[3] and the contrary effect on Z's best interest when Jessica removed him from Hawthorne and relocated and re-enrolled him in yet another location.[4] The District Court's findings of fact were supported by substantial evidence and the court did not abuse its discretion in its analysis of the best interests of the child.

---

[2] *See* § 40-4-212(1)(h), MCA ("continuity and stability of care").

[3] *See* § 40-4-212(1)(i), MCA ("developmental needs of the child").

[4] *See* § 40-4-212(1)(c), MCA ("the interaction and interrelationship of the child with the child's parent or parents and siblings and with any other person who significantly affects the child's best interest").

¶27　*3. Did the District Court err in denying Jessica's request for attorney fees and costs?*

¶28　Jessica's argument that the District Court erred in denying her attorney fees raises the application of § 40-4-212(4), MCA, which provides as follows:

> The following are rebuttable presumptions and apply unless contrary to the best interest of the child:
> (a) A parenting plan action brought by a parent within 6 months after a child support action against that parent is vexatious.
> (b) A motion to amend a final parenting plan pursuant to 40-4-219 is vexatious if a parent seeks to amend a final parenting plan without making a good faith effort to comply with the provisions of the parenting plan or with dispute resolution provisions of the final parenting plan.

Jessica further cites to § 40-4-219(5), MCA, which provides: "Attorney fees and costs must be assessed against a party seeking frivolous or repeated amendment if the court finds that the amendment action is vexatious and constitutes harassment." Jessica thus argues that because Daniel filed his motion within six months of a child support action, and without offering to mediate as provided in the Amended Plan, the statutory "vexatious presumptions" apply and the District Court was mandated to award her attorney fees and costs.

¶29　We initially note that it is not clear from the plain language of the statute that the presumption in § 40-4-212(4)(a), MCA, applies here. That section presumes that "a parenting plan action" brought within six months of a child support action is vexatious. In contrast, the next subsection, § 40-4-212(4)(b), MCA, presumes that a "*motion to amend* a final parenting plan*" is vexatious without a good faith effort to comply with the existing parenting plan. If § 40-4-212(4)(a), MCA, is referring to an original parenting

13

plan, in contrast to the reference in § 40-4-212(4)(b), MCA, to *a motion to amend* an existing parenting plan, then Jessica filed the original parenting plan action in 2005, nine years before Daniel's motion here. However, we need not resolve this issue of statutory interpretation here, for the following reasons.

¶30    Even if the statute is applicable, it makes the presumption rebuttable. The District Court clearly found that Daniel's motions were not vexatious, but meritorious. The clear implication of the District Court's order is that Daniel rebutted the vexatious presumptions. The record reveals that Jessica provided slim evidence that a child support action had been initiated within the previous six months, testifying only that she had made a report of Daniel being in arrears. On direct examination, her counsel asked her:

> Q. Okay. Have you ever reported the child support issue to the Child Support Enforcement Division?
> A. Yes.
> Q. When did you do that?
> A. June of 2014.

No other evidence of a "child support action" was introduced.

¶31    Then, on direct examination, Daniel's counsel asked him about his motivation for filing his motions to amend the parenting plan:

> Q. And is – was it this incident [at Hawthorne School] that prompted you then to come to the Court and seek a new parenting plan?
> A. I believe that I had filed a motion when things first – when things first arose with the incident at Hawthorne. But I began pursuing a new parenting plan once he had been moved to Wolf Creek.

Daniel also stated, "I really just want some stability for my son. I want him to be able to have a really great social life. I want him to have friends . . . . And I really want a stable home life that he will be able to focus the way that he needs to." Daniel's original pro se

14

motion was filed on November 19, 2014, the day immediately following the November 18, 2014 incident at Hawthorne School, supporting his testimony that his purpose was to provide stability for Z. The District Court ultimately agreed that Daniel had good reason to seek modification of the parenting plan, a conclusion inconsistent with acting vexatiously.

¶32 The rebuttable presumption provided for in § 40-4-212(4)(b), MCA, applies to cases involving a "motion to amend a final parenting plan." The record likewise rebuts any presumption that Daniel acted vexatiously by failing to act in good faith or to pursue mediation. Jessica's reckless actions in withdrawing Z from enrollment in Hawthorne School, without notice, and creating uncertainty about Z's future, justified Daniel's immediate appeal to the courts for assistance. After his motion was filed, both parties moved to vacate hearing dates so that they could pursue mediation, stating they were pursuing "a mutually agreeable parenting plan." The record shows that Daniel engaged in multiple efforts to resolve the dispute outside of the courtroom, rebutting any presumption that he had not acted in good faith or had failed to honor the mediation provision of the Amended Plan.

¶33 Affirmed.

/S/ JIM RICE

We Concur:

/S/ MIKE McGRATH
/S/ PATRICIA COTTER
/S/ LAURIE McKINNON
/S/ BETH BAKER

15