FILED

03/31/2026

Bowen Greenwood
CLERK OF THE SUPREME COURT
STATE OF MONTANA

Case Number: DA 25-0631

DA 25-0631

IN THE SUPREME COURT OF THE STATE OF MONTANA

2026 MT 68N

IN RE THE PARENTING OF
M.G.C.V.,

     Minor Child,

GRETCHEN ANNE VENTERS,

     Petitioner and Appellee,

  and

LUKE AARON VENTERS,

     Respondent and Appellant.

APPEAL FROM:    District Court of the Twentieth Judicial District,
                  In and For the County of Lake, Cause No. DR-24-60
                  Honorable Molly Owen, Presiding Judge

COUNSEL OF RECORD:

       For Appellant:

       Luke Aaron Venters, Self-Represented, Polson, Montana

       For Appellee:

       Hilly McGahan, Brandi R. Ries, Ries Law Group, P.C., Missoula,
       Montana

                      Submitted on Briefs:  February 11, 2026

                               Decided:  March 31, 2026

Filed:

                  _____
                            Clerk

Justice Katherine M. Bidegaray delivered the Opinion of the Court.

¶1 Pursuant to Section I, Paragraph 3(c), Montana Supreme Court Internal Operating Rules, this case is decided by memorandum opinion and shall not be cited and does not serve as precedent. Its case title, cause number, and disposition shall be included in this Court's quarterly list of noncitable cases published in the Pacific Reporter and Montana Reports.

¶2 Luke Venters (Luke) appeals from the Findings of Fact, Conclusions of Law, and Decree of Dissolution entered July 31, 2025, by the Twentieth Judicial District Court, Lake County, adopting the amended proposed parenting plan proposed by Gretchen Venters (Gretchen) which required Luke's parenting time with the parties' minor child to be supervised at a supervised visitation facility.

¶3 The parties were married in October 2022 and have one child together, M.G.C.V., born in 2023. Before the child was born, Luke was charged with partner or family member assault (PFMA) against Gretchen, following which he entered into a deferred prosecution agreement for the 2023 PFMA. The parties separated in May 2024 following Luke's arrest for PFMA against Gretchen while the child was present in the home. In June 2024, Gretchen filed a petition for a parenting plan while exploring legal separation. The parties reconciled, and the court dismissed the parenting case in July 2024. Gretchen declined to participate further in the 2024 PFMA investigation, and the State dropped the 2024 PFMA charge against Luke.

¶4	In November 2024, Gretchen moved to reopen the parenting case, alleging continued abusive behavior by Luke. She filed a petition for a temporary order of protection (TOP). The same day, the court issued a TOP and set a hearing for December 4, 2024.

¶5	At the TOP hearing, the parties reached an agreement resulting in an interim parenting plan and dismissal of the TOP. The court approved the interim parenting arrangement pursuant to which the child would reside primarily with Gretchen; Luke would have unsupervised weekday parenting time between noon and 6:00 p.m.; Luke would undergo a mental health evaluation involving Gretchen's input; and Gretchen would obtain her own evaluation. The interim parenting plan permitted the parties to travel together with the child to Boston, Massachusetts, from December 8 to 14, 2024. In its findings accompanying the approval of the interim parenting plan, the court stated that Luke had threatened to harm Gretchen and had been arrested twice for PFMA.

¶6	Following the parties' December 2024 trip, Gretchen filed another petition for TOP based on an incident at the Boston opera house involving Luke's alleged public verbal abuse that resulted in opera house staff getting involved. The court issued a TOP and set a hearing for January 3, 2025. Following the TOP hearing, the court extended the TOP for one month and limited Luke's contact with the child to twice-weekly supervised visits at Youth Connections.

¶7	On January 17, 2025, the parties participated in mediation and executed a confidential mediated settlement agreement on January 23, 2025. They agreed that Luke

3

would undergo a psychological evaluation within 30 days, with costs to be split equally, and that Luke's parenting time would remain supervised until completion of the evaluation and establishment of a new parenting agreement or amended parenting plan based on findings from Luke's psychological evaluation.

¶8 On February 7, 2025, Gretchen filed a petition for dissolution of marriage with a proposed parenting plan that required Luke's parenting time to be supervised. On March 14, 2025, Luke filed his response. Luke underwent a psychological evaluation on April 9, 2025, with Dr. Sara Boilen, who issued a report on April 28, 2025. Despite the mediated agreement, Luke did not pay any portion of the evaluation costs, and Gretchen covered the full expense by borrowing funds. The parties entered an agreed property distribution agreement in May 2025, resolving all financial issues.

¶9 On July 30, 2025, Luke appeared pro se and Gretchen appeared with counsel before the court to address a parenting plan, child support, and medical support. The court heard testimony from the parties and multiple witnesses, including experts, and admitted exhibits, including audio recordings spanning from February 2023 to October 2024. In one recording, Luke made statements about Gretchen's "mortal soul" and "hell." Gretchen testified Luke frequently used religion to justify his treatment of her, stating she was "trying to subvert his God-given authority." In other recordings, Luke called Gretchen a "whore," "bitch," "fucking cunt," and described her as a "cowardly, pig-headed, stupid, fucking idiot." Gretchen described the child's reaction during these incidents as "predominantly

4

very scared, crying or screaming." In some recordings, the parties' child could be heard crying in the background.

¶10 Dr. Sara Boilen, the psychologist who evaluated Luke, confirmed that the child was audible in the background of the recordings she reviewed. Dr. Boilen testified that the research is "very clear" that being in the presence of verbal and emotional abuse is an adverse childhood experience that contributes to long-term problems. Dr. Boilen explained that the "zero to three" age range is the "foundation" of a child's psychological development, and exposure to such trauma is akin to a "cracked or tilted foundation" in a house. Gretchen observed that the child is "easily startled" and has "delayed" speech, though she could not definitively name the cause.

¶11 Luke responded to the recordings. He acknowledged that the volume of his voice in the recordings was "jarring" and not "pleasant" to hear. He argued the recordings lacked context, claiming he was in the throes of a "trigeminal neuralgia attack" and was "shouting in distress" rather than aggression. He denied that the child was present or could hear the specific slurs used, asserting she was "asleep in another room" during most disagreements.

¶12 Luke offered visitation logs and third-party affidavits that the court excluded as inadmissible hearsay because the witnesses were not present to testify or lay foundation. On July 31, 2025, the court entered its decree in which it adopted Gretchen's Amended Proposed Final Parenting Plan; finding it to be in the child's best interest under § 40-4-212, MCA; requiring Luke's parenting time to remain supervised at a visitation facility; and prohibiting community-based supervision absent evaluator recommendation.

¶13    The District Court's findings addressed the relevant best-interest factors under § 40-4-212(1)(a)-(i), MCA, in detail. The court found that the child had resided primarily with Gretchen since birth and shared a close relationship with her. The court further found that Luke had engaged in repeated verbal abuse toward Gretchen, sometimes in the presence of the child, and that his conduct had caused distress and instability affecting the child's environment. In particular, the court found:

> [Luke] has been abusive towards [Gretchen] throughout their relationship, including in the presence of the child. [Luke] frequently became enraged at [Gretchen], engaging in an escalating patter[n] of threatening verbal and spiritual abuse, including using obscenities and gender-based slurs in the presence of the child. [Luke] once threatened to throw a car seat at [Gretchen] while the parties' baby was next to her, and to throw [Gretchen] down a hall. [Luke] has threatened to kill [Gretchen's] therapist and himself, and to harm [Gretchen].

The court also considered testimony regarding Luke's mental health history; evidence of prior domestic violence allegations; testimony from Luke's sister that, on at least two occasions when she was between the ages of 5 and 7 years old and Luke was between the ages of 16 and 18, Luke sexually assaulted her; testimony that Luke had never received sexual offender treatment; testimony from Gretchen's therapist regarding Gretchen's mental health and parenting skills; testimony from a Boston opera house employee regarding Luke's concerning conduct towards Gretchen at the ballet production; and numerous recordings of Luke verbally abusing Gretchen at times in their child's presence with the child crying in the background as Luke screamed obscenities and gender-based slurs at Gretchen. Based on the evidence presented, the District Court concluded that a parenting plan placing the child in Gretchen's primary care and providing for Luke to have

6

supervised parenting time up to three times per week for up to two hours per visit was in the child's best interest. The parenting plan required Luke to do the following to change his parenting time:

(1) participate in consistent and uninterrupted psychodynamic therapy consistent with the recommendations in Luke's psychological evaluation;

(2) arrange for a parenting evaluation to be conducted by Dr. Boilen or another professional agreed upon by both parties and paid for by Luke; and

(3) successfully complete a batterer's intervention program and all recommendations stemming from that program. A reevaluation of the parenting plan should not occur unless the professionals involved with the family determine that Luke has made therapeutic progress in addressing his mental health diagnoses, and meaningful positive changes that support increased and/or unsupervised contact with the minor child, based upon their professional opinions.

¶14 Luke, appearing pro se, appeals and raises numerous arguments challenging the parenting plan. He asserts the District Court improperly eliminated unsupervised parenting time, misapplied the parenting statutes, disregarded evidence favorable to him, violated his due process rights, and infringed upon his constitutional right to parent.

¶15 We review a district court's parenting plan determination for an abuse of discretion. *In re Marriage of Woerner*, 2014 MT 134, ¶ 12, 375 Mont. 153, 325 P.3d 1244. Findings of fact underlying a parenting determination are reviewed for clear error. *In re D.E.*, 2018 MT 196, ¶ 21, 392 Mont. 297, 423 P.3d 586.

¶16 Luke argues the District Court erred by ordering supervised parenting time without making findings required by § 40-4-219(1), MCA, of actual harm, threatened harm, or danger. Section 40-4-219(1), MCA, authorizes a court, in its discretion, to

7

amend a prior parenting plan if it finds, upon the basis of facts that have arisen since the prior plan or that were unknown to the court at the time of entry of the prior plan, that a change has occurred in the circumstances of the child and that the amendment is necessary to serve the best interest of the child.

Contrary to Luke's assertions, § 40-4-219, MCA, does not require findings of "actual harm, threatened harm, or danger." A statute that does address supervised visitation and danger is § 40-4-218(2), MCA, which Luke cites only in his reply brief. It provides: "If both parents or all contestants agree to the order *or* if the court finds that in the absence of the order the child's physical health would be *endangered* or the child's emotional development significantly impaired, *the court may order supervised visitation by the noncustodial parent*." Section 40-4-218(2), MCA. Because it is unclear on which of these statutes Luke relies in his appeal, we address both.

**Application of § 40-4-219(1), MCA, Did Not Prohibit the Court from Requiring Luke's Parenting Time to Be Supervised**

¶17 Luke argues that the District Court may have been constrained by § 40-4-219(1), MCA, to find that "*a change has occurred in the circumstances of the child*" to "amend" the interim parenting plan in this case. He contends that nothing in the record between December 2024 (when the court entered the interim parenting plan finding that it was in the child's "best interest to have frequent, continuing, consistent, and significant [unsupervised] contact with both parents") and July 2025 (when the court entered its final parenting plan requiring Luke's parenting time to be supervised at a visitation facility) supports reversing the court's December 2024 finding supporting unsupervised parenting time. To the contrary, the record reveals that (1) the court, following a January 3, 2025

TOP hearing, issued an order in which it limited Luke's contact with the child to twice-weekly supervised visits at Youth Connections; and (2) the parties agreed, at a January 17, 2025 mediation, that Luke's parenting time would remain supervised until completion of a psychological evaluation and establishment of a new parenting agreement or amended parenting plan based on findings from Luke's psychological evaluation.

¶18 Therefore, § 40-4-219(1), MCA, does not support Luke's argument because Luke's parenting time was subject to supervision at a visitation facility when the parties appeared for the final hearing. When the court entered its final parenting plan here, it did not "amend" an interim parenting plan; it continued the supervision requirement that was in place since the January 3, 2025 hearing, which the parties agreed to continue in their January 17, 2025 mediated settlement agreement. Even if § 40-4-219, MCA, applied, the Boston opera house incident and the subsequent January 2025 TOP constituted a clear "change in circumstances" since the original December 2024 interim agreement.

**Application of § 40-4-218(2), MCA, Did Not Prohibit the Court from Requiring Luke's Parenting Time to Be Supervised**

¶19 Luke also appears to rely on § 40-4-218(2), MCA, in arguing that the court erred by imposing supervision of parenting time without finding "actual harm, threatened harm, or danger." That subsection provides that a court "may order supervised visitation by the noncustodial parent" if the parties agree or if the court finds that, absent an order for supervision, "the child's physical health would be endangered or the child's emotional development significantly impaired." Section 40-4-218(2), MCA; *Bessette v. Bessette*, 2019 MT 35, ¶¶ 25-26, 394 Mont. 262, 434 P.3d 894.

¶20 Although Luke disagrees that this standard was met, the District Court's findings regarding Luke's dysregulation, verbal abuse, and threatening conduct constitute a *de facto* finding of emotional impairment to the child. Outside of the authority provided to a district court, pursuant to § 40-4-218(2), MCA, to order supervised visitation by the noncustodial parent, a district court "shall determine the parenting plan in accordance with the best interest of the child" and consider all relevant parenting factors, which may require it to order supervised parenting. *See* § 40-4-212(1), MCA.

**The District Court Acted within its Discretion When it Required Luke's Parenting Time to be Supervised**

¶21 The district court has broad discretion when determining a parenting plan. *In re Z.D.L.-B.*, 2016 MT 164, ¶ 25, 384 Mont. 65, 375 P.3d 378. Here, the District Court made thorough, comprehensive findings addressing each relevant factor, based upon the evidence presented at the final hearing. Given the admitted evidence, the District Court did not abuse its discretion in adopting the final parenting plan requiring Luke's parenting time to be supervised.

¶22 Although Luke disagrees with the court's evaluation of the evidence, appellate courts do not reweigh conflicting testimony or substitute their judgment for that of the district court. *Boeshans v. Boeshans*, 2025 MT 187, ¶ 30, 423 Mont. 450, 573 P.3d 1226. The District Court was in the best position to evaluate the credibility of witnesses and weigh the evidence presented at trial.

**The District Court Provided Luke with Due Process and a Fair Trial**

¶23 Luke further contends the District Court denied him due process. "Due process requires notice and the opportunity to be heard at a meaningful time and in a meaningful manner." *Steab v. Luna*, 2010 MT 125, ¶ 22, 356 Mont. 372, 233 P.3d 351. The record demonstrates that Luke received notice of the final trial, participated in the trial, testified extensively, and had the opportunity to present evidence and cross-examine witnesses. The fact that the court ruled against him does not establish a due process violation.

¶24 On July 16, 2025, Luke moved to continue the July 30, 2025 trial for two weeks to allow him time for discovery and witness preparation. Luke stated that his attorney had withdrawn and he needed additional time to review his psychological evaluation. But Luke's attorney withdrew in February 2025 (five months before the scheduled trial); the court set the trial in March 2025 (more than four months before Luke moved to continue it); Luke's psychological evaluation was issued April 28, 2025 (three months before the scheduled trial); and Gretchen had undertaken significant logistical effort to prepare for the trial as scheduled. Under these circumstances, the District Court did not deny Luke due process by denying his motion to continue.

¶25 Luke also argues that the District Court ignored evidence that he characterizes as exculpatory, including visitation reports and third-party affidavits. The District Court excluded those materials on evidentiary grounds—hearsay and lack of foundation—because witnesses were not present to testify at trial to lay foundation. Luke, appearing pro se, had the same obligation as any litigant to subpoena the authors of

the affidavits and the visitation logs or the facility director to lay foundation. The months of lead time Luke had between the trial setting in March and the trial in July to issue subpoenas demonstrates that the exclusion of his proffered third-party affidavits and visitation logs was a result of his own procedural failure, not a systemic denial of due process. The court acted within its discretion in applying the Montana Rules of Evidence in determining the admissibility of those materials.

**The District Court's Final Parenting Plan Does Not Infringe on Luke's Constitutional Right to Parent**

¶26 Finally, Luke asserts that the parenting plan infringes on his constitutional right to parent because of the supervision of his parenting time it requires. Parents possess a fundamental liberty interest in the care and custody of their children. *In re D.B.*, 2007 MT 246, ¶ 17, 339 Mont. 240, 168 P.3d 691. Nevertheless, district courts retain authority to impose reasonable restrictions on parenting time when necessary to protect a child's welfare. The final parenting plan here did not terminate Luke's parental rights; rather, it required supervised parenting time in a supervised visitation facility and allowed for reassessment of parenting time upon completion of certain therapeutic and evaluative conditions. The District Court set forth clear conditions—psychodynamic therapy and a batterer's intervention program directly tailored to address the dysregulation and abusive behavior the court found to support supervised parenting time—for Luke to meet to seek amendment of his parenting time.

¶27 Having reviewed the record, we conclude the District Court carefully considered the statutory best-interest factors and entered findings supported by evidence in the record.

Luke has not demonstrated that the District Court acted arbitrarily, exceeded the bounds of reason, or otherwise abused its discretion in adopting the final parenting plan.

¶28     We have determined to decide this case pursuant to Section I, Paragraph 3(c) of our Internal Operating Rules, which provides for memorandum opinions.  In the opinion of the Court, the case presents a question controlled by settled law or by the clear application of applicable standards of review.  The District Court's decision is affirmed.

/S/ KATHERINE M. BIDEGARAY

We Concur:

/S/ CORY J. SWANSON
/S/ JAMES JEREMIAH SHEA
/S/ INGRID GUSTAFSON
/S/ JIM RICE